**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 96-4310

ALVIN JUSTIN "BUDDY" HUGGINS,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 98-7351

ALVIN JUSTIN "BUDDY" HUGGINS,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of North Carolina, at New Bern.
Malcolm J. Howard, District Judge.
(CR-95-51)

Argued: June 8, 1999

Decided: September 15, 1999

Before ERVIN, HAMILTON, and WILLIAMS, Circuit Judges.

_____

Affirmed by published opinion. Judge Ervin wrote the opinion, in
which Judge Hamilton and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Susan Graham James, LAW OFFICE OF SUSAN G. JAMES & ASSOCIATES, Montgomery, Alabama, for Appellant. Anne Margaret Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Janice McKenzie Cole, United States Attorney, Raleigh, North Carolina, for Appellee.

_____

**OPINION**

ERVIN, Circuit Judge:

Appellant Alvin Justin "Buddy" Huggins ("Huggins") was convicted in 1996 of conspiracy to possess marijuana with the intent to distribute and aiding and abetting possession with intent to distribute marijuana, in violation of 21 U.S.C.A. §§ 841(a)(1) and 846. See 21 U.S.C.A. §§ 841(a)(1) (West 1981), 846 (West 1981 & Supp. 1999). The district court sentenced Huggins to a 210-month term of imprisonment followed by a three-year term of supervised release, and ordered him to pay a $10,000 fine.

Citing alleged insufficiency and inaccuracy of the trial transcript, Huggins moved for a new trial. The district court denied his motion. Huggins now appeals the court's order, arguing that the trial transcripts are so deficient they fatally prejudice his right to a meaningful appeal. Huggins also challenges the sufficiency of the evidence supporting his conviction and the court's decision to sentence him as a career offender.

Finding no reversible error, we affirm the district court's order of conviction and sentencing. We also affirm the court's denial of Huggins' motion for a new trial. Huggins urged us to adopt the less stringent standard applied in other circuits granting defendants who procure new counsel on appeal a new trial on merely a showing of substantial and significant omissions in the trial transcript. We decline to do so, however, and hold instead that a new trial is required only when the defendant can show that a flawed transcript specifically prejudices his ability to perfect an appeal.

2

I.

In July of 1994 the Carolina Freight Company of Phar, Texas notified Texas state investigators that a suspicious package had been dropped off for shipment. The package was addressed to the Fountain Body Shop in Ayden, North Carolina. Texas investigators obtained a search warrant and opened the box, finding inside a tool box containing 127 pounds of marijuana.

The investigators arranged with their counterparts in North Carolina to make a controlled delivery of the package. Upon receipt of the package, North Carolina State Bureau of Investigation ("SBI") agents opened it, confirmed the presence of marijuana within the toolbox, and had Carolina Freight Company telephone the Fountain Body Shop to set up the delivery.

Fountain McLawhorne ("McLawhorne"), owner of the Fountain Body Shop, answered the Carolina Freight phone call and informed the caller that he was not expecting a package. Eventually, McLawhorne agreed to take delivery of the package, stating that his friends often ordered packages in the name of the Fountain Body Shop to take advantage of various business discounts.

Prior to delivery, SBI agents took positions near the body shop to perform surveillance during the transaction. North Carolina SBI Agent Moser, posing as a Carolina Freight employee, delivered the package to the Fountain Body Shop. McLawhorne accepted the package and paid the $97.94 freight bill, stating that he did not know who had placed the order.

McLawhorne opened the package, found the tool box, and then, without opening it, put the tool box back into its cardboard container. McLawhorne later testified that he thought it strange that someone would order a tool box for $97 that could be purchased locally for $70.

Soon thereafter McLawhorne called the Carolina Freight Company to tell them that he had inspected the package and was certain that it was not his. McLawhorne asked Carolina Freight to pick up the pack-

3

age and refund his money. Carolina Freight notified North Carolina SBI Agent Basemore of McLawhorne's call; when Basemore himself telephoned the Fountain Body Shop McLawhorne again insisted that the package did not belong to him. At Agent Basemore's request, McLawhorne agreed to inquire of his friends whether anyone had ordered the package.

Among others, McLawhorne asked Huggins, the proprietor of the adjacent convenience store, whether he had ordered a tool box. McLawhorne knew that Huggins was awaiting delivery of an air compressor, but was unsure whether Huggins might also have ordered the tool box. Huggins responded that the tool box was not his, but that it might belong to a Steve Johnson ("Johnson"), whom Huggins had overheard mentioning an interest in buying a tool box.

Without conferring with Johnson, Huggins agreed to reimburse McLawhorne for the freight charge and to store the box in his storage building next door. McLawhorne then helped Huggins carry the package into a storage building on Huggins' property.

Soon after this transaction, Johnny Stanley ("Stanley") arrived at Huggins' store. Stanley backed his truck up to the door of Huggins' storage building. At trial, SBI agents testified that Huggins unlocked the door to his storage building and, with Stanley's help, loaded the box into the back of Stanley's truck. Within five minutes of driving away from Huggins' store, Stanley was stopped by the County Sheriff and placed under arrest for possession of marijuana.

Huggins was arrested soon after and both men were transported to the SBI Office in Greenville, North Carolina. North Carolina SBI agents driving Huggins to Greenville testified that Huggins asked "what this was all about," but when the white truck Stanley was driving came into view in the SBI parking lot, Huggins said "now I know."

The cardboard packaging, the tool box, and the marijuana were stored in the locked evidence vault in the Greenville SBI office. Following his arrest, Stanley phoned a cohort, Jeffrey Williams ("Williams"), and told him where the seized marijuana was being stored, indicating his desire to have the evidence destroyed. The fol-

4

lowing day, Williams broke into the SBI office, stole the marijuana, and stashed it in the woods outside Greenville.

Williams was later arrested for the theft and began cooperating with the Government. At trial, Williams testified that Stanley told Williams that he was expecting a large shipment of marijuana and that his last batch had arrived in an air compressor. Williams said that Stanley confessed that, although "Huggins was not in the deal, they were using [Huggins'] business as a delivery point." Incidentally, Steve Johnson, the man Huggins suggested might have ordered the tool box, was never produced at trial and it is unclear whether he even existed.

At the conclusion of a two-day jury trial, Huggins was convicted as charged and sentenced to 210 months of imprisonment. About six months after his conviction, Huggins moved for the production of his trial transcripts. The district court ordered Patricia Haynes ("Haynes"), the court reporter, to complete the transcripts. After waiting a month and a half, Huggins moved the court to show cause why Haynes should not be held in contempt for failing to produce the transcripts. Over the next year, Huggins filed several motions for a new trial and the district court denied them all, holding that the errors about which Huggins complained were insufficient to merit a new trial.

Huggins appeals the district court's order denying his motion for a new trial.

II.

Huggins challenges the sufficiency and accuracy of the transcript of his trial; he alleges that it contains so many omissions and inaccuracies that his appellate counsel cannot perfect his appeal and a new trial is warranted. We review the district court's denial of a motion for a new trial for abuse of discretion. See United States v. Arrington, 757 F.2d 1484, 1486 (4th Cir. 1985).

A.

A criminal defendant has a right to a meaningful appeal based on a complete transcript. See Hardy v. United States, 375 U.S. 277, 279

5

(1964). When a transcript is less than complete, the court must determine whether the alleged omissions or deficiencies justify a new trial. In United States v. Gillis, we held that whether an omission from a transcript warrants a new trial depends on whether the appellant has demonstrated that the omission "specifically prejudices his appeal . . . ." 773 F.2d 549, 554 (4th Cir. 1985).

Although he acknowledges our ruling in Gillis , Huggins urges us to follow the Fifth and Eleventh Circuits' view that a more lenient standard should apply where a defendant has procured new appellate counsel. Relying on the Fifth and Eleventh Circuit's holdings in United States v. Selva, and United States v. Preciado-Cordobas,[1] Huggins argues that when a defendant's appellate counsel did not represent him at trial, he should be granted a new trial when there are significant and substantial omissions from his trial transcript, rather than being required to make a showing of specific prejudice. See Selva, 559 F.2d 1303, 1306 (5th Cir. 1977); Preciado-Cordobas, 981 F.2d 1206, 1212 (11th Cir. 1993). The Fifth and Eleventh Circuits reasoned that an appellate attorney who was present at trial would be in a better position to highlight specific prejudice resulting from the omitted portions of the transcript, while a new appellate attorney would be unable to identify and correct transcript irregularities due to his absence from the trial. See Selva, 559 F.2d at 1306, Preciado-Cordobas, 981 F.2d at 1212.

This approach has not been widely followed, however. The majority of circuits have maintained that to obtain a new trial, whether or not appellate counsel is new, the defendant must show that the transcript errors specifically prejudiced his ability to perfect an appeal.[2]

_____

[1] The Eleventh Circuit in Preciado-Cordobas was bound by the Fifth Circuit's decision in Selva because Selva was issued before the Fifth Circuit split in October 1981. See Bonner v. City of Pritchard, Alabama, 661 F.2d 1206, 1207 (11th Cir. 1981).
[2] See United States v. Brand, 80 F.3d 560, 563 (1st Cir. 1996) (rejecting Selva and requiring a showing of specific prejudice); United States v. Sierra, 981 F.2d 123, 126 (3d Cir. 1992) (same); United States v. Antoine, 906 F.2d 1379, 1381 (9th Cir. 1990) (rejecting Selva's rigid distinction based on the absence or presence of new counsel on appeal when evaluating a motion for new trial); United States v. Gallo, 763 F.2d 1504, 1530 (6th Cir. 1985) ("We disagree, however, that a separate, less demanding test need be applied when a defendant is represented by new counsel on appeal.").

Although we recognize the Fifth and Eleventh Circuits' reasoning for the two-part standard has its advantages -- namely fairness to defendants who procure new counsel on appeal -- we think such a rule creates the perverse incentive of encouraging defendants to dismiss trial counsel and seek new appellate counsel whenever questions arise over the sufficiency of a trial transcript. Accord Sierra, 981 F.2d at 126. Our ruling in Gillis illustrates our preference for requiring a showing of specific prejudice and in concurrence with the majority view, we explicitly reaffirm that holding today.

B.

We turn now to the question of whether the alleged transcript errors specifically prejudiced Huggins' efforts to appeal. Prejudice is found when a trial transcript is so deficient that it is "impossible for the appellate court to determine if the district court has committed reversible error." United States v. Nolan, 910 F.2d 1553, 1560 (7th Cir. 1990). A review of Huggins' transcript reveals that, although there are errors and omissions, they do not prevent us from reviewing the district court's ruling, and thus do not rise to the level of specific prejudice.

As alleged, some of the dates on which events supposedly occurred were recorded inaccurately in the transcript. None of the inaccuracies undermine the strength of the evidence against Huggins, however. The errors amount to nothing more than typographical errors, for example, 1995 appears when the actual event happened in 1994. In each of these instances, the actual year the event occurred is consistently and readily verifiable in other places within the transcript.

Huggins also asserts that the presence of the word"indecipherable" in various places throughout the transcript renders the surrounding text incomprehensible. "Indecipherable" only appears in a few places and replaces nothing more than a single word in context or, in one instance, two sentences. Even though some of these omissions are within the government's closing arguments, the ideas conveyed are easily decipherable from the surrounding text. The same is true of the two sentences that are omitted; the concepts and thoughts communicated are similarly evident from the context and appellate counsel

7

should have been able to glean all of the information necessary to appeal any errors.

Finally, Huggins points to Agent Basemore's allegedly erroneous testimony regarding finding Huggins' fingerprints as an example of the fatal inaccuracies within the transcript. During his direct examination, Basemore initially suggested that Huggins' fingerprints were found on the package before it was even delivered to the Fountain Body Shop. Huggins argues that incorrect statements like Basemore's prove that the transcript is flagrantly deficient.

This argument is meritless. A quick reading of this section of the transcript makes clear that there was no error here. Basemore's evidently inaccurate statement resulted from his answering a series of the prosecutor's questions that departed from the chronological narrative. The awkward line of questioning created this apparent inaccuracy, not the faulty recording of the transcript. Furthermore, Basemore corrected his statement on the very next page of the transcript stating that Huggins' fingerprints were found on the package only after delivery giving appellate counsel adequate information from which to perfect Huggins' appeal.

Perhaps the most damaging counter to Huggins' argument, however, is the fact that the district court gave Huggins ample opportunity to correct any remaining transcript errors and he declined to do so. In response to Huggins' initial motion for a new trial, the district court held a hearing to discuss the sufficiency of the transcript. In an effort to correct alleged errors and omissions, the district court supplemented the transcript with copies of documents and trial notes retained by the court. The court then certified the record stating its complete satisfaction that after careful review the transcript provided Huggins with sufficient information to perfect an appeal. Convinced that all transcript errors had been corrected, the district court still invited Huggins to submit a proposed statement indicating what he believed remained missing from the transcript. Huggins failed to submit such a statement and instead filed a renewed motion for a new trial, reiterating the same claims of error.

After carefully reviewing the record, it appears that the inaccuracies and omissions in the transcript were not substantial in amount

8

and did not occur at particularly significant periods during the trial. In summary, they did not specifically prejudice Huggins' ability to identify issues for appeal. Finding that the district court did not abuse its discretion by denying Huggins' motion for a new trial, we affirm.

III.

Huggins also argues that the evidence presented at trial was insufficient to support his conviction. When assessing the sufficiency of the evidence of a criminal conviction on direct review,"[t]he verdict of [the] jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942).

To obtain a conspiracy conviction pursuant to 18 U.S.C. § 846, the government must prove that (1) Huggins and Stanley had an agreement to possess marijuana with the intent to distribute, (2) Huggins knew of the conspiracy, and (3) Huggins knowingly and voluntarily became part of the conspiracy. See United States v. Burgos, 94 F.3d 849, 857 (4th Cir. 1996). The government may show the existence of a conspiracy through either direct or circumstantial evidence. See id.

Huggins asserts no specific allegations of error, making only a general assertion that there was "simply no evidence" that he was involved in the conspiracy any more than McLawhorne. The record shows otherwise, however. The evidence shows that although unsure about whether his friend Steve Johnson actually ordered the tool box, Huggins paid the $97 freight bill and took possession of the package. It was also established that Huggins then notified, not Steve Johnson, but Stanley, who came and picked up the parcel. The evidence made clear that Stanley and Huggins took some pains to take a circuitous route while moving the package from the storage building to Stanley's truck. Based on this evidence as well as other circumstantial evidence, reasonable jurors could have found that all elements of the alleged conspiracy were proven and that Huggins was guilty as charged.

Huggins also insists that because the chain of custody of the marijuana was broken when the drugs were stolen from the SBI office,

9

any evidence regarding the marijuana should be disregarded. There is little merit to this contention.

The testimony of Agent Basemore and Williams -- the man who confessed to stealing the marijuana from the SBI after being tipped off to its location by Stanley -- establish that the marijuana presented at trial was the same as that received by Huggins and removed by Stanley. Both Williams and Basemore testified to the exact location of the marijuana after it was stolen from the SBI office and, when state agents located the marijuana in the woods, it was in the same marked tool box it was in when delivered to McLawhorne's shop. The break in the chain of custody caused by the robbery was addressed by Basemore and Williams' testimony and we find that a reasonable trier of fact could have relied on this evidence when deciding to convict Huggins.

When taking the view most favorable to the government, we find that there was substantial evidence supporting Huggins' conviction and we affirm the jury's verdict.

IV.

Finally, Huggins argues that the district court erred by sentencing him as a career offender pursuant to § 4B1.1 of the United States Sentencing Guidelines Manual ("USSG"). See USSG § 4B1.1 (1998). We review the sentencing court's findings of fact related to sentencing for clear error and give deference to its application of the Sentencing Guidelines to the facts. See United States v. Cutler, 36 F.3d 406, 407 (4th Cir. 1994).

To qualify as a career offender, a defendant must have "at least two prior felony convictions of either a crime of violence or a controlled substance offense." USSG § 4B1.1(3). "Two prior felony convictions" is defined in USSG § 4B1.2(c)(2), which incorporates USSG § 4A1.2(a), (b), and (c). Section 4A1.2(a)(2) provides that prior sentences imposed in unrelated cases are counted separately, but prior sentences imposed in related cases are counted together as a single sentence. See USSG § 4A1.2(a)(2). Among other things, prior sentences are related if they were consolidated for trial or sentencing. See USSG § 4A1.2 Application Note 3. Huggins contends that, because

10

the two prior convictions relied on by the district court to classify him as a career offender were consolidated for sentencing, they are related offenses counted together as a single sentence. The government counters that, because there was an intervening arrest, the two sentences cannot be related and should be counted separately.

The Commentary to the USSG provides that "[p]rior sentences are not considered related if they were for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense)." Id. Huggins' Pre-Sentencing Report ("PSR") shows that there was an intervening arrest. Paragraphs 16 through 19 of the PSR indicate that Huggins was arrested for his first offense on March 3, 1987, one month prior to committing his second offense on April 2, 1987. According to the USSG Commentary, Huggins' April arrest is clearly an intervening arrest. Because there was an intervening arrest, Huggins cannot avoid classification as a career offender by arguing that his offenses were related.

Finding no error, we affirm the district court's application of the career offender statute here.

V.

For the foregoing reasons, we affirm the district court's denial of Huggins' motion for a new trial.

AFFIRMED

11