Filed: February 2, 2000

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 94-5511
(CR-92-270-MU)

United States of America,

Plaintiff - Appellee,

versus

William Arthur Brown,

Defendant - Appellant.

O R D E R

The court amends its opinion filed January 18, 2000, as follows:

On page 3, second full paragraph, line 1 -- "June 21, 1993" is corrected to read "July 21, 1993."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                        No. 94-5511

WILLIAM ARTHUR BROWN,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Chief District Judge.
(CR-92-270-MU)

Argued: September 22, 1999

Decided: January 18, 2000

Before MURNAGHAN, MICHAEL, and KING, Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded with instructions by
published opinion. Judge King wrote the opinion, in which Judge
Murnaghan and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Noell Peter Tin, RAWLS & DICKINSON, P.A., Char-
lotte, North Carolina, for Appellant. Gretchen C.F. Shappert, Assis-
tant United States Attorney, Robert Jack Higdon, Jr., Assistant United
States Attorney, Charlotte, North Carolina, for Appellee.

_____

**OPINION**

KING, Circuit Judge:

William Arthur Brown appeals his multiple convictions on the following charges: one count of violating 21 U.S.C.§ 848 (engaging in a "continuing criminal enterprise" ("CCE")); one count of violating 21 U.S.C. § 846 (conspiracy to violate the drug laws ("drug conspiracy")); and four counts of violating 18 U.S.C. § 1956 ("money laundering"). Brown argues that each of his six convictions should be reversed based on the trial court proceedings relating to his lawyer's conflict of interest.[1] In the alternative, Brown asserts that his CCE conviction must be reversed for two reasons. The first arises from the omission of two jury instructions that Brown claims were mandated, and the second concerns Brown's contention that his convictions for both CCE and drug conspiracy violate the constitutional prohibition against double jeopardy.

Based on the record and recent controlling Supreme Court precedent, we reverse Brown's CCE conviction and remand for re-sentencing on the drug conspiracy charge. Finding no other error, we affirm each of Brown's other convictions and the sentences thereon.

I.

On October 6, 1992, a grand jury in the Western District of North Carolina returned an eleven-count indictment against Brown. On July 29, 1993, following an eight-day jury trial, Brown was convicted on six counts.[2]

_____

[1] Brown also contends that the Government improperly influenced witnesses by offering plea agreements in exchange for testimony. Br. for Appellant at 45 (citing United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), rev'd en banc, 165 F.3d 1297 (10th Cir. 1999)). We have previously considered and rejected this argument, and it is entirely without merit. See, e.g., United States v. Feurtado, 191 F.3d 420, 425 (4th Cir. 1999).

[2] The jury also acquitted Brown on one money laundering count under 18 U.S.C. § 1956(a)(1)(A), and the Government dismissed three other money laundering charges and a charge of using or carrying a firearm in relation to a drug trafficking crime, see 18 U.S.C. § 924(c)(1).

A.

Brown was represented at trial by three lawyers: (1) Anita Rivkin-Carothers; (2) Robert F. Simone; and (3) Calvin E. Murphy. During pre-trial proceedings, Ms. Rivkin-Carothers served as Brown's lead counsel,[3] with Mr. Murphy assisting as local counsel. On July 16, 1993, three days before trial, Mr. Simone filed a notice of appearance and moved the court for admission pro hac vice, representing that: "It is my intention to assist and work with local counsel, Calvin E. Murphy, and Anita Rivkin-Carothers, who will act as lead counsel in this matter."

On July 21, 1993, before the third day of trial began, the Government filed a motion to recuse Mr. Simone. The motion was based on the Government's discovery (the previous day) that Mr. Simone had been convicted on federal racketeering and extortion charges.[4] The district court held a hearing on the Government's motion that same morning, with Brown present throughout. After the lawyers for both sides presented their positions,[5] the district court explained to Brown, inter alia, that Mr. Simone's conviction could present a conflict of interest because Mr. Simone might attempt to get some personal ben-

_____

[3] Ms. Rivkin-Carothers entered an appearance in this case on June 11, 1993, concurrently moving the court for admission pro hac vice. The district court granted her motion on June 16, 1993.

[4] In October 1991, a federal grand jury in the Eastern District of Pennsylvania indicted Mr. Simone on six racketeering and extortion counts. In December 1992, following prosecution by the Department of Justice, a jury convicted Simone on five counts. In May 1993, Mr. Simone was sentenced to four years' incarceration, and he initiated appeals of his convictions on May 8, 1993. On August 5, 1993, the State of Pennsylvania suspended Simone's license to practice law. Approximately a year later, Mr. Simone's appeal was denied, and he began his prison term.

[5] At that hearing, the Government argued that, because Mr. Simone was being prosecuted by the United States, he had a conflict between his personal interests and Brown's interests. Mr. Simone responded that recusal was not necessary; that he had been convicted at trial on federal felony charges; that his case was on appeal; that he expected to be exonerated; that he was still a member in good standing of the Pennsylvania Bar; and that he had recently been permitted to practice in federal court despite his convictions.

3

efit, at Brown's expense, from the federal prosecutors. Brown then assured the court that he understood the problem, and the court asked Brown whether he wanted to proceed: (1) with Mr. Simone as one of his trial lawyers (along with Ms. Rivkin-Carothers); (2) with Ms. Rivkin-Carothers as his only trial lawyer; or (3) in some other way. Brown responded that he wanted to keep Mr. Simone as one of his lawyers. The court then denied the Government's motion to recuse, thus permitting Mr. Simone to represent Brown, as co-counsel with Ms. Rivkin-Carothers and Mr. Murphy.**6**

Unfortunately, the court reporter lost that part of the trial transcript relating to the recusal hearing. Thus, Brown filed a statement in the district court, pursuant to Fed. R. App. P. 10(c), summarizing the recusal hearing. The Government responded with its own statement, and without a hearing, the district court adopted the Government's statement, concluding that "the Government's recitation of the events in question most closely comports with [the court's] own recollection of these events." J.A. 1174. The court added that, "[T]he Court recalls that Mr. Simone ably represented Appellant Brown. In particular, the Court recalls that Mr. Simone conducted an aggressive and effective cross-examination of government witnesses." Id.

B.

In addition to the arguments based on Mr. Simone's conflict, Brown contends that his CCE conviction must be overturned because the district court erroneously failed to give two unanimity instructions to the jury in connection with that charge. See infra at 10. Brown's counsel preserved his assertion of error on the first instruction by timely objecting to the district court's instructions and requesting the additional instruction. However, his lawyers did not request the second instruction or object on this basis at trial.

Brown also argues that his separate convictions for CCE and drug conspiracy violate the Fifth Amendment's prohibition on double jeopardy. There are several facts relevant to this argument. The underlying crimes alleged in support of the CCE charge in Count One of Brown's

_____

**6** Mr. Murphy, the local counsel, apparently was not actively involved in the trial itself.

4

indictment were: (1) Brown's violation of 21 U.S.C. § 841 (drug possession with intent to distribute); and (2) his participation in a drug conspiracy operating between January 1988 and September 21, 1992, in violation of 21 U.S.C. § 846. That same drug conspiracy was also the basis for the separate drug conspiracy charge in Count Two of Brown's indictment. Brown was convicted on both charges, and the district court sentenced him to 360 months of incarceration for both convictions, without distinguishing a specific sentence for either offense.[7] The court also imposed a "special assessment" of $300 collectively on all of Brown's convictions, which included $50 on the CCE conviction and $50 on the drug conspiracy conviction. In addition to those sentences, the court imposed a 240-month term of incarceration on the four money laundering convictions, to run concurrently with the sentence for the CCE and drug conspiracy convictions.

The district court entered its final judgment on April 15, 1994, after which Brown timely appealed his convictions and the sentences thereon. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

The Government concedes that one of Brown's lawyers, Mr. Simone, was operating under a conflict of interest when he represented Brown at trial. Brown argues that this conflict mandates reversal because the record does not establish that he knowingly and intelligently waived the conflict of interest, and because the conflict adversely affected his defense. We review these arguments in turn.

_____

[7] The court's sentencing colloquy provided:

> At this time, the Court will state a proposed sentence.
>
> I propose that Mr. Brown serve a term of incarceration of 360 months on Counts One and Two; that he serve a term of incarceration of 20 years per count on Counts Five, Six, Seven and Ten, to be served concurrently with the terms on Counts One and Two, for a total of 360 months[.]

J.A. 1148-49. This proposed sentence was then imposed, and the district court's Judgment in a Criminal Case provided: "Cts. 1 & 2: Three hundred and sixty (360) months." J.A. 1153.

A.

Brown first contends that the lack of a trial transcript of the recusal hearing mandates a new trial. We review de novo the district court's compliance with the Court Reporter Act, 28 U.S.C. § 753(b), and Fed. R. App. P. 10(c).

Brown is correct that the Court Reporter Act requires a complete transcript of trial proceedings, and there is no doubt that "[a] criminal defendant has a right to a meaningful appeal based on a complete transcript." United States v. Huggins, 191 F.3d 532, 536 (4th Cir. 1999). However, omissions from a trial transcript only warrant a new trial if "the missing portion of the transcript specifically prejudices [a defendant's] appeal." United States v. Gillis, 773 F.2d 549, 554 (4th Cir. 1985); Huggins, 191 F.3d at 536. Indeed, we recently reaffirmed our rule that "to obtain a new trial, whether or not appellate counsel is new, the defendant must show that the transcript errors specifically prejudiced his ability to perfect an appeal." Huggins, 191 F.3d at 537.

Brown asserts that, without a complete transcript, his "ability to challenge the validity of his alleged waiver is practically nonexistent." While Brown might be unable to successfully challenge his waiver of Simone's conflict, it is not the lack of the complete hearing transcript that prevents him from doing so. Brown's recollection of the recusal hearing does differ slightly from the Government's version, but Brown is unable to demonstrate prejudice because he does not dispute the central facts necessary for appellate review of the recusal ruling. See infra note 9. In fact, Brown's two disputes with the Government's Rule 10(c) statement -- (1) claiming that he was not informed of the precise federal charges on which Mr. Simone had been convicted; and (2) claiming that he did not see the Government's recusal motion at the recusal hearing -- are irrelevant in light of Brown's concession that, when he waived Mr. Simone's conflict, he knew and understood the core of the Government's recusal motion. Id. Brown's demand for a new trial based on an incomplete transcript thus fails. Simply put, he does not demonstrate any legitimate prejudice, or even argue that there are discrepancies between his recollection of the recusal pro- ceeding and the Government's version thereof that require resolution

6

by reference to the transcript. Under these circumstances, we are unable to find prejudice in an incomplete transcript.**8**

B.

It is well established that, "[A]lthough a defendant may waive his right to conflict-free representation, such waiver must be knowing, intelligent, and voluntary." United States v. Gilliam, 975 F.2d 1050, 1053 (4th Cir. 1992) (citations and quotations omitted). Brown claims that his waiver of Mr. Simone's conflict was not knowing or intelligent because he did not understand: (1) the precise federal charges on which Simone had been convicted; (2) that a sentence-- including a term of incarceration -- had been imposed on Simone; (3) that Simone was under an order to "show cause" why his license should not be revoked; and (4) that Simone was representing himself on appeal. We review Brown's waiver of his lawyer's conflict de novo, as we would a waiver of the right to counsel itself. United States v. Singleton, 107 F.3d 1091, 1097 n.3 (4th Cir. 1997).

Brown relies upon our decision in Hoffman v. Leeke, 903 F.2d 280 (4th Cir. 1990), to support his argument that his waiver was invalid. In Hoffman, a case in which one attorney represented two co-defendants, we held a waiver of conflicted counsel invalid where the appellant did not know that his lawyer had advised his co-defendant to testify against him. Id. at 289. Our decision there was buttressed by another important fact: the lawyer had not informed the appellant that he had negotiated a plea agreement requiring the co-defendant to implicate the appellant. Id.

By contrast, under Brown's version of the recusal hearing, he knew that Mr. Simone had been "convicted in federal court, but that he was

_____

**8** Brown's argument that reversal is required because the trial court did not "perform its necessary fact-finding function" in connection with the Rule 10(c) proceedings is also unavailing. Contrary to Brown's assertion, the trial court was under no mandate to conduct a hearing. See Fed. R. App. P. 10(c). Further, the district court's order makes clear that it reviewed both Rule 10(c) statements before making the determination that the Government's account of the recusal hearing was accurate.

7

out on bail." J.A. 1163.**9** Further, Brown does not dispute that the district court informed him at the recusal hearing that: (1) Simone was "in trouble" with the Justice Department; (2) Simone was operating under a conflict because federal prosecutors -- who were prosecuting Brown -- were also prosecuting Simone; and (3) this conflict might affect Simone's representation because Simone might try to curry favor in his own case by sacrificing Brown. Finally, there is no dispute that after Brown was so informed, the district court asked whether Brown wanted Simone to continue to represent him, notwithstanding this conflict. Brown responded that he "wanted to have Mr. Simone continue as [his] attorney." J.A. 1164.

When a lawyer is operating under a conflict of interest as serious as the one here, that lawyer, the Government, and the district court should provide the defendant with as much relevant information as possible about the conflict before the court accepts a waiver of the conflict of interest. However, if a defendant waives the conflict with knowledge of the crux of the conflict and an understanding of its implications, the waiver is valid -- even if the defendant does not know each detail concerning the conflict.**10** Thus, even if we were to

_____

**9** For example, Brown concedes that, "[p]rior to trial, Mr. Simone informed me that he had been convicted in federal court, but that he was out on bail and was in good standing with the Pennsylvania Bar." J.A. 1163. Brown further notes:

> On the first day of trial, while the jury was out, the attorneys had a sidebar conference with the judge.
>
> The judge then inquired whether I wanted to continue with Mr. Simone representing me, knowing that he had been in trouble with the Justice Department.
>
> I indicated that I wanted to have Mr. Simone continue as my attorney.

J.A. 1163-64.

**10** In his Supplemental Brief, Brown argues that he was not able to waive Mr. Simone's conflict at all. We find this argument without merit. Especially where -- as here -- a defendant has several lawyers, a defendant may certainly waive a conflict held by one of them. See Gilbert v. Moore, 134 F.3d 642, 652-53 (4th Cir. 1998) (discussing, generally, waiver of right to conflict-free counsel).

8

agree that Brown did not know all the facts relating to Mr. Simone's conflict, the record establishes that he clearly knew enough to make a knowing, intelligent, and voluntary waiver.**11**

We therefore affirm the district court's rulings relating to Mr. Simone's conflict of interest, and find this assertion of reversible error to be unfounded.

III.

Brown also asserts other bases for reversal of his CCE conviction -- arguments grounded in the jury instructions and in his concurrent convictions on both the CCE and drug conspiracy charges.

A.

To establish that a defendant was engaging in a continuing criminal enterprise, the Government must prove, <u>inter alia</u>, a violation of the drug statutes where "such violation is a part of a continuing series of violations[.]" 21 U.S.C. § 848(c). Brown claims that the district court should have instructed the jury that, prior to returning a guilty verdict on the CCE charge, unanimity was required on: (1) the specific predicate offenses constituting the "continuing series"**12** and (2) that Brown himself committed the offenses constituting the"continuing series."**13**

_____

**11** Our conclusion here is buttressed by the other facts relating to Brown's representation at trial. Brown had at least one other lawyer present throughout the trial to further assure adequate representation. Although the presence of a second lawyer is not dispositive of Brown's claim, Ms. Rivkin-Carothers served as Brown's lead counsel, and Brown has not challenged any aspect of her representation. Moreover, while Brown asserts that Mr. Simone's representation was ineffective -- a claim more appropriately pursued in a collateral proceeding -- the alleged deficiencies in Simone's performance are unsupported here and have no apparent or articulated nexus with Simone's conflict. Those assertions thus cannot serve as the basis for reversal.

**12** Because Brown properly preserved this objection, we review the denial of his request for this supplemental jury instruction for an abuse of discretion. <u>United States v. Helem</u>, 186 F.3d 449, 454 (4th Cir. 1999).

**13** Brown failed to request this instruction at trial, and we would therefore review its omission for plain error. <u>United States v. Rogers</u>, 18 F.3d 265, 268 (4th Cir. 1994).

9

At trial, Brown requested the first of these instructions, but the district court denied Brown's request, likely relying upon our decision in United States v. Hall, 93 F.3d 126 (4th Cir. 1996) (noting that this instruction was not required).**14**

After Brown's trial, but before this case was argued on appeal, the Supreme Court held that the first of the absent instructions of which Brown complains (i.e., that the jury was bound to unanimously find the specific violations constituting the "continuing series") was required in a CCE trial. See Richardson v. United States, 119 S. Ct. 1707, 1713 (1999). In so holding, the Court rendered our observation in Hall incorrect, but left open the question of whether failure to instruct in this manner is structural error -- mandating a new trial -- or whether such failure is subject to harmless error analysis. Id. Thus, we must first determine whether a Richardson error, which occurred here, is subject to harmless error analysis.

In this regard, we join our sister circuits in holding that a Richardson error is not a structural defect; rather, we hold that it is subject to harmless error analysis. See United States v. Escobar-de Jesus, 187 F.3d 148, 161-62 (1st Cir. 1999) (holding that harmless error analysis applies to Richardson CCE instruction error); United States v. Long, 190 F.3d 471, 476 n.3 (6th Cir. 1999) (stating that harmless error analysis applies to Richardson error). Another recent Supreme Court case applying harmless error analysis in analogous circumstances, Neder v. United States, 119 S. Ct. 1827 (1999), also provides strong support for our conclusion. There, the district court had instructed the jury (over the defendant's objection) that it "need not consider" the materiality of a false statement (an essential element

_____

**14** In Hall, we observed that:

> In fact, we are especially loathe to find reversible error when Hall received a more generous instruction than the statute requires. The district judge instructed the jury to "unanimously agree on which three acts constitute[d] the continuing series of violations." The statute, however, demands only that the jurors agree that there was a continuing series, not that they agree on which offenses make up that series.

Hall, 93 F.3d at 129.

10

of the offense) because that question was not "for the jury to decide." Id. at 1832 (quotations omitted). This instruction was given erroneously,**15** and the misinstruction permitted the jury to convict the defendant without making a determination on the essential element of materiality. Nonetheless, the Neder Court held this erroneous instruction did not constitute structural error: "[A]n instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." Id. at 1833 (alteration in original).

Although the error in Neder was based on a misinstruction, and the Richardson error here is based on the omission of a required instruction,**16** both errors effectively withdrew an element of the offense from the jury's consideration. Thus, under Neder's reasoning, we are confident that harmless error analysis is appropriately applied in our review of a Richardson error. Having so determined, we turn to the application of that analysis to this case.

B.

In conducting a harmless error analysis, our task is to determine whether "the guilty verdict actually rendered [at] trial was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279 (1993); United States v. Hastings, 134 F.3d 235, 241 (4th Cir. 1998) ("When, over a proper objection, a district court erroneously instructs the jury on an element of the offense, the error may be disregarded as harmless if a reviewing court can determine, beyond a reasonable doubt, that a correctly instructed jury would have reached the same conclusion."). We thus ask the question: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty

_____

**15** In United States v. Gaudin , 515 U.S. 506 (1995), the Supreme Court held that the materiality element was a jury question.

**16** The court instructed the jury that the Government had to prove the "continuing series" element beyond a reasonable doubt and also that "[t]he phrase `a continuing series of violations' means three or more violations of the Federal narcotics laws which are in some way related to one another." The instruction was deficient in that it failed to require unanimous juror agreement about the specific violations constituting the "continuing series."

11

absent the error?" Neder, 119 S. Ct. at 1838. There are at least two methods for making this determination.

1.

First, if an Appellant claims that an omitted instruction permitted the jury to convict without making required findings, and an appellate court can determine that the jury necessarily made those findings notwithstanding the omission, the error is harmless. One such example would occur if the jury that convicted a defendant on a CCE charge also convicted that defendant of at least three related drug violations, and the related violations were also alleged to be predicate violations constituting the "continuing series." See Escobar-de Jesus, 187 F.3d at 162; Long, 190 F.3d at 476 n.3; cf. United States v. King, 169 F.3d 1035, 1040-41 (6th Cir. 1999) (holding any potential error harmless where defendant was separately convicted by same jury of all predicate -- and related -- offenses).[17] Another such circumstance would surface if the district court instructed the jury that a "continuing series of violations" means "three or more violations," and the Government introduced evidence of only three predicate offenses. In both of these instances, an appellate court -- on review of a CCE conviction -- can conclude beyond a reasonable doubt that the jury necessarily made the required finding.

Here, the Government concedes that "the jury panel may not have reached agreement as a body as to which three violations supported their verdict," Supp. Br. for Appellee at 5, and it does not assert that it introduced evidence of only three predicate violations in support of the CCE conviction. However, the Government maintains -- in an assertion raised for the first time at oral argument-- that Brown's four money laundering convictions demonstrate unanimous juror agreement about the specific offenses constituting the "continuing series."

_____

17 Indeed, in the appellate decisions finding a Richardson error harmless, the jury also convicted the defendant of at least three of the predicate violations that the Government had alleged in support of the "continuing series." See Escobar-de Jesus, 187 F.3d at 162; Long, 190 F.3d at 476 n.3.

12

However, the CCE statute provides that only violations of subchapters I and II of Title 21 of the United States Code -- drug violations -- can constitute predicate offenses in the "continuing series." See 21 U.S.C. § 848(c). Because the money laundering charges were violations of a different title and subchapter -- 18 U.S.C. § 1956 -- those convictions cannot be predicate offenses under the CCE statute. Further, the money laundering charges in Brown's indictment were not based on specific drug violations; rather, they were based on the allegation that Brown laundered money that was obtained from unspecified illegal drug-related activity. The Government's reliance on the money laundering convictions is therefore misplaced, and must be rejected.

In these circumstances, we are unable to conclude that the jury necessarily agreed upon the specific predicate acts constituting the required "continuing series."

2.

Under the Neder Court's harmless error framework, a Richardson error still may be harmless even if we cannot determine that the jury necessarily found the omitted element. First, "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." Neder, 119 S. Ct. at 1837. Thus, if the element was uncontested[18] and supported by over-

_____

[18] We note that there is some tension in an appellate court deeming an element "uncontested" when the element emerged as a consequence of a change in the law after trial. See Neder, 119 S. Ct. at 1837 (relying on fact that defendant did not contest an element "to the jury" in determining that the evidence was "uncontested"). For example, the Hall decision, supra, would have led Brown to believe that the jury was not required to unanimously determine the specific violations constituting the "continuing series." See supra note 14. In these circumstances, where the Government does not even charge the defendant with those specific violations, defense counsel could have made the strategic decision to spend valuable time before the jury challenging the Government's evidence on the essential elements. Speculating that a defendant could not have challenged an element not then at issue represents an untoward leap of logic.

13

whelming evidence, the harmless error inquiry ends, and we must find the error harmless.

On the other hand, if the defendant contested the omitted element, Neder mandates a second inquiry. In that event, we must determine whether the "record contains evidence that could rationally lead to a contrary finding with respect to that omitted element." Id. at 1839. If not, then the error is harmless. But if the element was genuinely contested, and there is evidence upon which a jury could have reached a contrary finding, the error is not harmless.[19] It is not harmless because, in that circumstance, we cannot determine beyond a reasonable doubt that the "jury verdict would have been the same absent the error." Id. at 1838.

Pursuant to Neder, we have endeavored to determine, beyond a reasonable doubt, whether the jury would have returned a guilty verdict on the CCE count if it had been properly instructed to agree on at least three specific violations constituting the "continuing series." Although the Government did not argue (or even state in conclusory fashion) that it proved the Richardson elements of the CCE offense by "overwhelming" and "uncontested" evidence,[20] we have reviewed the record submitted to us in order to glean: (1) which predicate violations the Government sought to prove; (2) whether the Government introduced "overwhelming" evidence to prove each violation; and (3) whether Brown genuinely contested that violation such that there is

_____

[19] The Second Circuit has construed Neder to require an additional step: "If [there was sufficient evidence to permit a jury to find in favor of the defendant on the omitted element, we must determine] whether the jury would nonetheless have returned the same verdict of guilty." See United States v. Jackson, 196 F.3d 383, 385-86 (2d Cir. 1999). We do not believe that Neder requires this additional inquiry; rather, Neder makes clear that if, for example, an appellate court determines that "the defendant contested the omitted element and raised evidence sufficient to support a contrary finding[,] it should not find the error harmless," and the harmless error inquiry must end. Neder, 119 S. Ct. at 1838.

[20] The Government argues that the evidence introduced at trial "clearly supported" the finding that Brown had engaged in a series of criminal violations, but it does not argue that proof of any of those violations was "uncontested."

14

evidence upon which the jury could have concluded that Brown did not commit the violation.

We have done our best to identify the specific predicate offenses upon which the Government relied; however, the grand jury did not specifically enumerate them in Brown's indictment, the Government never specifically listed them at trial, and the district court did not identify them in its instructions. We thus have turned for guidance to the Government's evidence at trial. In this regard the Government submitted voluminous testimony to the jury, but in closing argument relied principally upon several alleged predicate drug offenses.[21]

_____

[21] Our review of the Government's closing remarks unearthed the following allegations of possible predicate violations:

> (a) Bynum and Brown make, inter alia, a "nine-ounce deal" for cocaine. J.A. 1019.
>
> (b) Lark makes several deals for heroin with Brown: one eight-ounce deal, two one-ounce deals, and two one-hundred gram deals. J.A. 1021.
>
> (c) Adams purchases heroin with Brown. J.A. 1022.
>
> (d) Adams makes one-ounce deal that was "cut-up" at Brown's place. J.A. 1022.
>
> (e) Morrow "getting heroin and cocaine from" Brown. J.A. 1022.
>
> (f) Cathcart distributes Brown's heroin. J.A. 1023.
>
> (g) Sloan sells heroin for McClain, who worked for Brown. J.A. 1023.
>
> (h) Sloan witnesses Brown picking-up three "bundles" of heroin at the Waffle House. J.A. 1024.
>
> (i) Odom and her husband sell heroin for Brown. J.A. 1024.
>
> (j) Turner distributes heroin for Brown on several occasions. J.A. 1025, 1028.
>
> (k) Huntley purchases heroin from Brown on several occasions. J.A. 1026.
>
> (l) Tillman purchases heroin for Brown. J.A. 1026.
>
> (m) Adams and Brown deliver heroin to "Dit." J.A. 1028.
>
> (n) Adams and Brown possess and prepare cocaine for distribution. J.A. 1030.

15

Those alleged offenses were supported by testimony from witnesses Samuel L. Bynum, Jeffrey E. Lark, Jack O. Adams, Lynn E. Morrow, James W. Cathcart, Tonya D. Sloan, Mary Odom, Patricia Turner, Leroy Huntley, Jr., and Arthur Tillman. Brown attempted to impeach each of these Government witnesses -- and most other Government witnesses -- at least on the basis that those witnesses were testifying in support of the Government's case in exchange for reduced sentences.[22] In addition, each of these witnesses had a substantial criminal record that Brown's lawyers exposed to the jury on cross-examination.

Brown also elicited other testimony impeaching the credibility of several witnesses and contradicting the Government's proof of those violations. Among other things, Bynum testified that he did not know if Brown ever received the nine ounces of cocaine underlying one of the Government's alleged predicate violations. J.A. 78-79. Bynum also contradicted himself at least once -- first testifying on direct examination that Brown took over his drug business, then stating on cross-examination that this was not true. J.A. 204. Similarly, Lark could not remember specific details of the predicate violations that his testimony supported, J.A. 382, and Brown's counsel attempted to impeach Adams and Sloan on cross-examination by prior inconsistent statements. J.A. 287 (Adams), J.A. 596-600 (Sloan). Further, Morrow could not remember the full extent of her own criminal record, and she testified that she dealt drugs with Brown at a time when Brown was actually incarcerated. J.A. 434, 450, 477, 1009-10.

_____

[22] Bynum, Lark, Adams, Odom, and Tillman agreed that they were testifying in exchange for various considerations from the Government. J.A. 117-20 (Bynum); J.A. 378-79 (Lark); J.A. 299 (Adams); J.A. 635 (Odom); J.A. 842 (Tillman). Morrow agreed that she had given substantial assistance to the Government in exchange for reduced time. J.A. 494. Cathcart denied that he had been promised anything by the Government in exchange for his testimony, J.A. 546-49, but he had not yet entered a plea on his charges. Finally, Sloan, Turner, and Huntley testified that they had entered into plea agreements with the Government, J.A. 589 (Sloan); J.A. 717 (Turner); J.A. 782-83 (Huntley), and those agreements provided for Government recommendations of lower sentences in exchange for cooperation. J.A. 27 (Sloan); J.A. 53-55 (Turner); J.A. 35-43 (Huntley).

16

Brown thus genuinely contested the evidence supporting each of the alleged predicate offenses, and there was a basis in the record for the jury to have rationally disbelieved the testimony of any of the Government's witnesses. Put simply, the Government's case turned upon the credibility of witnesses whose vulnerabilities were exposed by Brown's lawyers, and we are unable to discern which of these witnesses were actually believed and relied upon by the jury. Our uncertainty is amplified by the fact that the jury was not given an enumeration of the possible predicate offenses that could constitute the "continuing series." This factual setting leads us to conclude: (1) that omitting the Richardson instruction could have "permitt[ed the] jury to avoid discussion of the specific factual details of each violation," thus potentially covering-up "wide disagreement among the jurors about just what the defendant did, or did not, do"; and (2) that the jurors could have failed to focus upon specific factual details in the absence of the Richardson instruction,"simply concluding from testimony, say, of bad reputation, that where there is smoke there must be fire." Richardson, 119 S. Ct. at 1711. As the Supreme Court has indicated, these are two of the uncertainties sought to be avoided by a Richardson instruction. In the absence of such an instruction, we run head-on into each of them in this case.

In this circumstance, we are unable to conclude, beyond a reasonable doubt, that the jury would have agreed upon three specific predicate offenses, and Neder dictates the result:

> If . . . the court cannot conclude beyond a reasonable doubt
> that the jury verdict would have been the same absent the
> error -- for example, where the defendant contested the
> omitted element and raised evidence sufficient to support a
> contrary finding -- it should not find the error harmless.

Neder, 119 S. Ct. at 1838. We must therefore reverse Brown's CCE conviction.**23**

_____

**23** Because we reverse Brown's CCE conviction based on the omission of the first of the two instructions discussed supra at 9-10, we do not decide whether the omission of the second instruction constitutes plain error.

17

C.

Brown also challenges his CCE and drug conspiracy convictions on double jeopardy grounds, a claim that we review de novo. See United States v. McManus, 23 F.3d 878, 884 (4th Cir. 1994) (a "defendant convicted [of CCE] may not also be convicted for any predicate conspiracy charges proved as elements of the [CCE]") (internal quotations omitted); United States v. Imngren, 98 F.3d 811, 813 (4th Cir. 1996) (noting that de novo standard of review applies to double jeopardy claims). However, because we have reversed Brown's CCE conviction and sentence thereunder,**24** Brown's double jeopardy claim is now moot.

Although the claim is moot, we call attention to one aspect of Brown's sentence. The district court imposed a $300 "special assessment" collectively on all of Brown's convictions pursuant to 18 U.S.C. § 3013, which, in 1994, required a special assessment of $50 per offense on any person convicted of a felony against the United States. When this assessment is imposed twice for the same act, the Supreme Court has held that it is a "collateral consequence" amounting to an "impermissible [double] punishment." Rutledge v. United States, 517 U.S. 292, 302-03 (1996). The Government concedes that the drug conspiracy was a lesser-included offense to the CCE charge here; therefore, because Brown was assessed $50 twice -- for both the CCE and drug conspiracy convictions -- we remand with instructions to vacate one of these $50 assessments.

D.

Finally, the district court imposed a single unitary sentence of 360 months on "Counts One and Two" -- the CCE count and the drug conspiracy count respectively. Under these circumstances, having found reversible error in the CCE conviction, we are compelled to vacate that unitary sentence. However, because we reverse only Brown's CCE conviction, and because he has not challenged the balance of the district court's sentencing determinations, we remand with

_____

**24** Should the Government successfully retry Brown on the CCE charge, this issue could again be ripe for consideration.

18

instructions for the district court to reconsider only a portion of its overall sentencing decision.

The district court began its sentencing analysis with the United States Sentencing Commission, Guidelines Manual, § 2D1.1 (Nov. 1998) ("USSG").**25** The court first found that 3.6 kilograms of heroin was involved in the drug conspiracy; thus, under USSG § 2D1.1(a)(3) & § 2D1.1(c)(3), the court determined that the base offense level was 34. Next, pursuant to USSG § 2D1.1(b)(1), the court found that a firearm was involved and increased the base offense level by 2 levels for an adjusted offense level of 36. Brown has not challenged either of these determinations, and both of them apply equally to the drug conspiracy conviction.**26** We thus affirm the district court's sentencing determinations to this point and hold that they apply to the drug conspiracy sentencing analysis to be conducted on remand.

However, we vacate the sentencing determinations that followed. The court first increased the base offense level by 4 levels under USSG § 2D1.5(a)(1) because of the CCE conviction, and since the total of 40 exceeds 38, the trial court imposed a sentence grounded on an adjusted offense level of 40. See USSG § 2D1.5(a)(2). The district court declined to increase Brown's sentence based on his "role in the offense" because the court believed that "the CCE already has a role in the offense level computed." J.A. 1144. We note that the four-level increase under USSG § 2D1.5(a)(1) is also applicable under a drug conspiracy conviction, but it is for the district court to determine: (1) whether to increase Brown's drug conspiracy base offense level of 36 by 4 levels based on USSG § 2D1.5; (2) whether the "role in the offense" adjustment is warranted under USSG § 3B1.1; and (3) the appropriate sentence thereunder.

_____

**25** Although we cite to the November 1998 Sentencing Guidelines Manual, Brown's sentencing took place in April 1994, the Guidelines applicable at that time are controlling, and the relevant provisions are unaltered.

**26** As discussed above, the drug conspiracy charge and CCE charge covered the same time frame, the same evidence was submitted in support of each conviction, and the testimony that the district court credited in finding 3.6 kilograms of heroin was submitted in relation to the drug conspiracy that "began in 1988 and continued until September 1992." J.A. 1088, 1090.

19

IV.

Because the Government cannot establish that the <u>Richardson</u> error was harmless, we reverse Brown's CCE conviction, vacate his unitary sentence for the separate CCE and drug conspiracy convictions, and remand these aspects of Brown's case for such proceedings as may be appropriate. Finding no other reversible error, we affirm Brown's other convictions and the sentences imposed thereon.

<u>AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED WITH INSTRUCTIONS</u>

20