**Peter MONSANTO, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**No. 97 Civ. 4700 RJW.**
**No. S 87 Cr. 555 RJW**

United States District Court,
S.D. New York.

April 20, 2001.

The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York City, By Colleen P. Cassidy, of Counsel, for Petitioner.

Mary Jo White, United States Attorney for the Southern District of New York, New York City, By Anirudh Bansal, of Counsel, for Respondent.

## OPINION

WARD, District Judge.

Petitioner, Peter Monsanto, has moved to vacate his conviction pursuant to 28 U.S.C. § 2255 based on the Court's erroneous jury instruction concerning the crime of engaging in a continuing criminal enterprise. For the reasons hereinafter stated, petitioner's motion is denied and the petition is dismissed.[1]

## BACKGROUND

On October 14, 1987, the government filed an Indictment against Monsanto and others charging them with racketeering, murder, narcotics distribution, weapons possession, and tax evasion. Of relevance to this motion are Counts One, Two, Three, and Four of the Indictment.

Count One charged Monsanto with participating in the affairs of a racketeering enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). This Count alleged that Monsanto committed several predicate racketeering acts, three of which were narcotics-related: Racketeering Act ("R.A.") 5, conspiracy to distribute heroin from in or about December 1981 up to and including the date of the filing of the indictment; R.A. 7, possession with intent to distribute heroin at 933 Sheffield Road, Teaneck, New Jersey; and R.A. 8, possession with intent to distribute heroin at 250 Gorge Road, Cliffside Park, New Jersey.

In addition, Count Two of the Indictment charged Monsanto with conspiring to participate in the affairs of a racketeering enterprise, or RICO conspiracy, in violation of 18 U.S.C. § 1962(d). This Count incorporated by reference all of the predicate offenses alleged in Count One, including R.A. 5, 7, and 8.

Also relevant to this petition is Count Three, which charged Monsanto with engaging in a narcotics distribution conspiracy, in violation of 21 U.S.C. § 846. Several overt acts contained in Count Three alleged that Monsanto supplied heroin to various individuals who then distributed the heroin for resale. Overt Acts ("O.A.")

---

1. In *Monsanto v. United States*, 97 Civ. 4700, S 87 Cr. 555, 1999 WL 649047 (S.D.N.Y. Aug.25, 1999), and *Monsanto v. United States*, 97 Civ. 4700, S 87 Cr. 555, 2000 WL 1206744 (S.D.N.Y. Aug.24, 2000), the Court denied Monsanto habeas relief on the other grounds raised in his § 2255 petition.

1 through 7 charged that Robert Cofer, Larry Caldwell, Arnold Lawson, Gary Simmons, Alex Simmons, Eddie Simmons, William Norris, Sedgwick Harvey, Lawrence Williams, and Barry Judd distributed heroin which they received from Monsanto.

Count Four of the Indictment charged Monsanto with operating a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848. The CCE charge also incorporated by reference the racketeering acts alleged in Count One and realleged in Count Two, as well as the narcotics distribution conspiracy alleged in Count Three.

Trial commenced on January 19, 1988 and lasted six months. The parties presented over one hundred witnesses and more than nine hundred exhibits. At the close of the evidence, the Court instructed the jury on the law for each count. With respect to Count Four, the CCE charge, the Court instructed the jury that in order to find Monsanto guilty of operating a CCE, it must find unanimously: (1) that Monsanto committed one or more violations of the narcotics laws; (2) that the narcotics offenses committed by Monsanto were part of a continuing series of violations of the narcotics laws; (3) that Monsanto undertook to commit this series of violations in concert with five or more persons either named or unnamed in the Indictment; (4) that Monsanto occupied the position of organizer, supervisor, or manager with respect to each of these five or more persons; and (5) that Monsanto obtained substantial income or resources from this continuing series of violations. *See* Tr. at 15,554.[2]

The Court did not instruct the jury that it had to unanimously agree on which narcotics violations comprised the "series of violations" under the second element of the

CCE charge. However, the Court instructed the jury that, in determining whether Monsanto had engaged in a "series of violations," it could look to the narcotics violations charged in the Indictment, including the narcotics conspiracy charged in Count Three, as well as acts which were not charged in the Indictment, but which were proven by the government. *See id.* at 15,557–558.

Monsanto was convicted on all counts in the Indictment. In finding Monsanto guilty on Count One, the jury found that the government proved that he had committed, among others, R.A. 5, conspiracy to distribute heroin from in or about December 1981 up to and including the date of the filing of the indictment, and R.A. 7, possession with intent to distribute heroin at 933 Sheffield Road, Teaneck, New Jersey. However, the jury found that the government had not proved R.A. 8, possession with intent to distribute heroin at 250 Gorge Road, Cliffside Park, New Jersey. In finding Monsanto guilty of Count Two, RICO conspiracy, the jury found that the government proved that he had conspired to commit all three narcotics-related racketeering acts, including R.A. 8.

On his direct appeal to the Second Circuit, Monsanto argued that the CCE charge was erroneous because, among other things, it did not require that the jury agree on which particular narcotics violations comprised the "series of violations" making up the second element of the crime. Although the Second Circuit did not directly address this argument, in addressing a different argument, the court stated that the government need not plead or obtain convictions on any of the eligible predicate offenses, but may instead simply prove at trial a continuing series of at least three felony offenses. *See United States*

---

2. References to "Tr." are to the trial transcript.

*v. Simmons*, 923 F.2d 934, 952 (2d Cir.), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991), *and cert. denied*, 502 U.S. 943, 112 S.Ct. 383, 116 L.Ed.2d 334 (1991).

Monsanto filed the instant § 2255 petition on or about March 12, 1997, seeking to vacate his CCE conviction. On June 1, 1999, while Monsanto's § 2255 petition was pending, the Supreme Court decided *Richardson v. United States*, 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). The Court held that "a jury in a federal criminal case brought under § 848 must unanimously agree not only that the defendant committed some 'continuing series of violations' but also that the defendant committed each of the individual 'violations' necessary to make up that 'continuing series.'" *Id.* at 815, 119 S.Ct. 1707. In light of *Richardson*, it became clear that this Court committed error in its jury instruction on the CCE count. The Court therefore granted the parties' request to file additional briefs.

Relying on *Richardson*, Monsanto argues that his CCE conviction must be vacated because this Court failed to instruct the jury that it had to agree unanimously as to the specific violations making up the "continuing series of violations" on the CCE count and that it had to find Monsanto guilty of those violations beyond a reasonable doubt. The government argues that *Richardson* should not be retroactively applied to this case and that, even if it were to apply, the error was harmless.

## DISCUSSION

### I. Retroactivity

In deciding whether the *Richardson* decision applies retroactively, the Court must determine whether the Supreme Court announced in *Richardson* a new rule of criminal procedure or one of substantive law.

"This distinction between substance and procedure is an important one in the habeas context." *Bousley v. United States*, 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

In *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the Court held that a new rule of criminal procedure will not be given retroactive application unless the new rule satisfies one of two exceptions. *See id.* at 310, 109 S.Ct. 1060. The rule will apply retroactively only if it "places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe,'" or could be considered a "watershed rul[e] of criminal procedure." *Id.* at 311, 109 S.Ct. 1060 (quoting *Mackey v. United States*, 401 U.S. 667, 692, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971)).

 However, *Teague* applies only to procedural rules, and thus, is inapplicable to substantive decisions in which the Supreme Court decides the meaning of a criminal statute enacted by Congress. *See Bousley*, 523 U.S. at 620, 118 S.Ct. 1604. Supreme Court decisions "holding that a substantive federal criminal statute does not reach certain conduct ... necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal.'" *Id.* (quoting *Davis v. United States*, 417 U.S. 333, 346, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974)). Such substantive decisions are presumed to apply retroactively. *See, e.g., United States v. Mandanici*, 205 F.3d 519, 525 (2d Cir.), *cert. denied*, —— U.S. ——, 121 S.Ct. 190, 148 L.Ed.2d 132 (2000) (stating that "a new rule of substantive criminal law is presumptively retroactive because a defendant may have been 'punished for conduct that simply is not illegal'" (quoting *Bilzerian v. United States*, 127 F.3d 237, 242 (2d Cir.1997), *cert. denied*, 527 U.S. 1021, 119 S.Ct. 2365, 144 L.Ed.2d 770 (1999))).

In *Davis v. United States,* the Supreme Court held that, in determining whether a new substantive decision is to be applied retroactively, "the appropriate inquiry [is] whether the claimed error of law [is] 'a fundamental defect which inherently results in a complete miscarriage of justice,' and whether '[i]t ... present[s] exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.' " *Davis,* 417 U.S. at 346, 94 S.Ct. 2298 (quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)) (third alteration in the original). Petitioner in *Davis* met this standard because the decision narrowed the criminal statute at issue so that petitioner could have been convicted for conduct which was not illegal. *See id.* at 346–47, 94 S.Ct. 2298.

As the Third Circuit Court of Appeals recognized, "[t]he facts of *Davis* present the paradigm of a case involving a new substantive criminal decision. In *Davis,* as in nearly all the decisions in which courts have retroactively applied a new substantive criminal decision, the defendant's conviction itself was potentially invalid due to an intervening change in law." *United States v. Woods,* 986 F.2d 669, 677 (3d Cir.), *cert. denied,* 510 U.S. 826, 114 S.Ct. 90, 126 L.Ed.2d 58 (1993). However, whether the new decision decriminalizes conduct is not the standard set forth in *Davis.* There is nothing in *Davis,* or in any other precedent that this Court is aware of, to suggest that a new decision is substantive *only if* it results in a conviction for an act that the law does not make criminal. *See, e.g., United States v. Tayman,* 885 F.Supp. 832, 842 (E.D.Va.1995) ("A substantive rule may establish that the defendant was innocent or that he should not have been convicted of a crime, but not all substantive rules do so.").

Turning to the *Richardson* decision, in framing the question presented, the Court stated:

[W]e must decide whether the statute's phrase "series of violations" refers to one element, namely a "series," in respect to which the "violations" constitute the underlying brute facts or means, *or whether those words create several elements, namely the several "violations," in respect to each of which the jury must agree unanimously and separately* .... If the statute creates a single element, a "series," in respect to which individual violations are but the means, then the jury need only agree that the defendant committed at least three of all the underlying crimes the Government has tried to prove. The jury need not agree about which three. *On the other hand, if the statute makes each "violation" a separate element, then the jury must agree unanimously about which three crimes the defendant committed.*

526 U.S. at 817–18, 119 S.Ct. 1707 (emphasis added). The Court also found that the word "violations" as used in the CCE statute has a "legal ring." *Id.* at 818, 119 S.Ct. 1707. The Court said:

A "violation" is not simply an act or conduct; it is an act or conduct that is contrary to law.... To hold that each "violation" here amounts to a *separate element* is consistent with a tradition of requiring juror unanimity where the issue is whether a defendant has engaged in conduct that violates the law.

*Id.* at 818–19, 119 S.Ct. 1707 (emphasis added).

The Court thus held that each narcotics violation making up the "continuing series of violations" is a separate element of the CCE crime that, consistent with longstanding principles of criminal procedure, must be found by a jury unanimously beyond a reasonable doubt. If each violation

were not an "element" of the crime, the Court would not have held that each violation had to be found by a unanimous jury beyond a reasonable doubt. *See, e.g., In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (holding that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"). In reaching its conclusion, therefore, the Supreme Court clearly redefined the substance of the CCE crime, and not the procedure by which juries reach their verdict.

In addition, Monsanto's claim meets the standard for retroactivity set forth in *Davis*. Monsanto argues that the jury would not have convicted him on the CCE crime had this Court charged the jury in a manner consistent with *Richardson*. Assuming for present purposes that Monsanto is correct, the error results in a complete miscarriage of justice and presents exceptional circumstances warranting the relief afforded by habeas corpus. Monsanto's interest in having his claim reviewed is especially compelling because it was his legal position, raised but not addressed on direct appeal, that was vindicated in *Richardson*. *See Ianniello v. United States*, 10 F.3d 59, 62–3 (2d Cir.1993).

■ The Court therefore finds that *Richardson* announced a new substantive rule of law which applies retroactively. *Accord United States v. Lopez*, 248 F.3d 427, 431–32 (5th Cir. 2001); *Lanier v. United States*, 220 F.3d 833, 838 (7th Cir.), *cert. denied*, —— U.S. ——, 121 S.Ct. 312, 148 L.Ed.2d 250 (2000); *Murr v. United States*, 200 F.3d 895, 905–06 (6th Cir.2000); *Benevento v. United States*, 81 F.Supp.2d 490, 492–93 (S.D.N.Y.2000). *But see Rice v. United States*, 118 F.Supp.2d 451, 452 (S.D.N.Y.2000) (holding that *Richardson* is not retroactive). Having held that collat-

eral review of the *Richardson* error is available to Monsanto, the Court must now decide whether the error was harmless.

## II. Harmless Error

### A. Whether Harmless Error Applies

■ The Supreme Court has not addressed whether a *Richardson* error is subject to harmless error analysis. While it is well-recognized that most constitutional errors can be harmless, some errors are so intrinsically harmful as to require automatic reversal. *See Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). This latter group of errors is made up of those structural defects that affect " 'the framework within which the trial proceeds, rather than simply an error in the trial process itself.' " *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). Such errors " 'infect the entire trial process,' and 'necessarily render a trial fundamentally unfair.' " *Id.* (citations omitted). Structural defects of this nature have been found in only a very limited class of cases such as the complete denial of counsel, a biased trial judge, racial discrimination in the selection of the grand jury, denial of the right to self-representation, denial of a public trial, and a defective reasonable doubt instruction. *See id.* (citing cases).

In *Neder*, the trial court instructed the jury that it need not consider the materiality of a false statement made in violation of a number of federal criminal statutes penalizing fraud because materiality was a question for the court to decide. The Supreme Court found that this instruction was erroneous as it withdrew from the jury an essential element of the offense. Such an omission, the Court noted, was analogous to a misdescription of an essential element of a crime, an error that the Court had already held is subject to harm-

less error analysis. *See id.* at 9–10, 119 S.Ct. 1827. The Court found that omitting an essential element from a jury charge "differs markedly from the constitutional violations we have found to defy harmless-error review." *Id.* at 8, 119 S.Ct. 1827. Such an omission "does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Id.* at 9, 119 S.Ct. 1827. Based on these considerations, the Court held that an erroneous instruction that omits an element of an offense is subject to harmless error analysis.

■ The *Richardson* error in this case was the failure to inform the jury that each violation making up the "series of violations" of the CCE crime is a separate element of the crime which must be unanimously agreed upon by the jury. By failing to so instruct the jury, the Court effectively withdrew these elements from the jury's consideration. As such, the error,

like that in *Neder*, was a trial error rather than a structural one, and harmless error analysis applies. *Accord Lanier*, 220 F.3d at 838–39; *United States v. Brown*, 202 F.3d 691, 699 (4th Cir.2000); *United States v. Escobar–de Jesus*, 187 F.3d 148, 161–62 (1st Cir.1999), *cert. denied*, 528 U.S. 1176, 120 S.Ct. 1208, 145 L.Ed. 1110 (2000); *Rice*, 118 F.Supp.2d at 452–53; *Benevento*, 81 F.Supp.2d at 493.[3]

## B. Which Harmless Error Test Applies

The correct standard for the Court's harmless error inquiry is not settled. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Court held that a conviction would be vacated unless the government could prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. 824.

**3.** Monsanto argues that because *Richardson* held that each narcotics violation in a "continuing series of violations" is an element of the CCE crime which must be found unanimously by a jury, the failure to charge each violation in the Indictment is a jurisdictional defect not subject to harmless error analysis. *See, e.g., United States v. Tran*, 234 F.3d 798, 806 (2d Cir.2000) (stating that plain error review is inappropriate where a defect in an indictment is jurisdictional and that where an indictment fails to allege each material element of an offense, it fails to charge that offense). According to Monsanto, the Indictment in the present case fails to allege each narcotics violation which was part of the "continuing series of violations." However, the Second Circuit has explained:

> [A]n indictment must "charge[ ] a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." Nevertheless, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."

*United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir.1998) (citations omitted).

The Indictment in the present case alleged that from December 1981 to the date of the filing of the Indictment, Monsanto engaged in a CCE by repeatedly violating various provisions of the narcotics laws, which provisions were explicitly identified in the Indictment. The Indictment also alleged that such violations were part of a continuing series of violations, undertaken by Monsanto in concert with at least five other persons with respect to whom Monsanto occupied the positions of organizer, supervisor, and manager, and that Monsanto obtained substantial income and resources from the CCE. Finally, the Indictment stated that the continuing series of violations includes, but is not limited to, the narcotics violations identified as Racketeering Acts under Count One of the Indictment, and the narcotics conspiracy identified in Count Three of the Indictment, which included several overt acts relating to narcotics distribution. These narcotics violations were described in sufficient detail, including stating the approximate time and place they occurred, to satisfy the *Alfonso* standard.

However, in 1993, the Supreme Court decided that the traditional *Chapman* standard should not be applied to cases on collateral review. *See Brecht v. Abrahamson*, 507 U.S. 619, 622–23, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Under the new standard articulated in *Brecht*, which is less burdensome to the government, a court reviewing a habeas petition may vacate a conviction only where the constitutional error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at 623, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

The government argues that since Monsanto has raised the *Richardson* issue on his collateral appeal, the Court should evaluate the error under the *Brecht* harmless error standard. However, Monsanto contends that *Brecht* applies only where a petitioner has already had his claim evaluated under *Chapman* on direct review. According to Monsanto, where, as here, the claim is being raised for the first time on collateral review, *Brecht* is inapplicable and the more stringent *Chapman* test should be applied.

*Brecht* reached the Supreme Court after four separate courts applied some type of harmless error review to petitioner's case, three of which applied a variation of *Chapman*. *See Brecht*, 507 U.S. at 625–27, 113 S.Ct. 1710. The Court held that a less burdensome harmless error standard applies on collateral review because the standard is "better tailored to the nature and purpose of collateral relief than the *Chapman* standard, and application of a less onerous harmless-error standard on habeas promotes the considerations underlying [the Court's] habeas jurisprudence." *Id.* at 623, 113 S.Ct. 1710. The Court recognized that the writ of habeas corpus has traditionally been regarded as an "extraor-

dinary remedy," reserved for those "whom society has grievously wronged and for whom belated liberation is little enough compensation," and that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Id.* at 633–34, 113 S.Ct. 1710 (internal quotation marks and citations omitted). Recognizing the distinction between direct and collateral review, the Court has traditionally applied different standards on habeas than would be applied on direct review with respect to matters other than harmless error analysis. *See id.* at 634–35, 113 S.Ct. 1710 (citing cases).

The Court identified the reason most frequently advanced for distinguishing between direct and collateral review as "the State's interest in the finality of convictions that have survived direct review within the state court system." *Id.* at 635, 113 S.Ct. 1710. In addition to finality, the Court spoke of comity and federalism. As the Court said, " '[t]he States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.' " *Id.* (quoting *Engle v. Isaac*, 456 U.S. 107, 128, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)). Finally, the Court recognized that liberal allowance of the writ of habeas corpus " 'degrades the prominence of the trial itself,' and at the same time encourages habeas petitioners to relitigate their claims on collateral review." *Id.* (citations omitted). In sum, these concerns can be characterized as (1) the state's interest in finality, (2) comity, (3) federalism, and (4) preserving the sanctity of the trial process.

Considering the implication of these four concerns, courts are not in agreement on whether *Brecht* applies on collateral review if a petitioner's claim was never evaluated under the more stringent *Chapman* standard. The First, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits have all held, consistent with the government's argument in this case, that *Brecht* applies regardless of whether the error complained of was ever evaluated under *Chapman. See Bains v. Cambra,* 204 F.3d 964, 976–77 (9th Cir.), *cert. denied,* —— U.S. ——, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000); *Gilliam v. Mitchell,* 179 F.3d 990, 995 (6th Cir.1999), *cert. denied,* 528 U.S. 1120, 120 S.Ct. 945, 145 L.Ed.2d 821 (2000); *Hassine v. Zimmerman,* 160 F.3d 941, 950–52 (3d Cir.1998), *cert. denied,* 526 U.S. 1065, 119 S.Ct. 1456, 143 L.Ed.2d 542 (1999); *Hogue v. Johnson,* 131 F.3d 466, 498–99 (5th Cir.1997), *cert. denied,* 523 U.S. 1014, 118 S.Ct. 1297, 140 L.Ed.2d 334 (1998);[4] *Sherman v. Smith,* 89 F.3d 1134, 1140–41 (4th Cir. 1996), *cert. denied,* 519 U.S. 1091, 117 S.Ct. 765, 136 L.Ed.2d 712 (1997); *Brewer v. Reynolds,* 51 F.3d 1519, 1529 (10th Cir. 1995), *cert. denied,* 516 U.S. 1123, 116 S.Ct. 936, 133 L.Ed.2d 862 (1996); *Tyson v. Trigg,* 50 F.3d 436, 446–47 (7th Cir.1995), *cert. denied,* 516 U.S. 1041, 116 S.Ct. 697, 133 L.Ed.2d 655 (1996); *Horsley v. Alabama,* 45 F.3d 1486, 1492 n. 11 (11th Cir.), *cert. denied,* 516 U.S. 960, 116 S.Ct. 410, 133 L.Ed.2d 328 (1995); *Singleton v. United States,* 26 F.3d 233, 236, 237 n. 9 (1st Cir.), *cert. denied,* 513 U.S. 1003, 115 S.Ct. 517, 130 L.Ed.2d 423 (1994).[5]

These courts first note that, while the constitutional error complained of in *Brecht* had been reviewed under *Chapman* by a state court on direct review, the Supreme Court did not limit its holding to such situations. Rather, the plain language of *Brecht* indicates that on collateral review generally, the more liberal harmless error standard applies. *See, e.g., Hassine,* 160 F.3d at 951. The question of whether there had been a previous *Chapman* analysis was of "minor importance to the Court's view that the *Kotteakos* standard should be applied consistently in collateral proceedings." *Id.* at 952; *see also id.* at 951 (noting that the *Brecht* holding was based primarily on a finding that " 'the costs of applying the *Chapman* standard on federal habeas outweigh the additional deterrent effect, if any, that would be derived from its application on collateral review.' " (quoting *Brecht,* 507 U.S. at 636, 113 S.Ct. 1710)).

Perhaps most significantly, these courts assert that comity, federalism, and a state's interest in finality are implicated any time a federal court reviews a state court proceeding, regardless of whether the state court had conducted a harmless

---

**4.** It is noteworthy that another panel of the Fifth Circuit Court of Appeals disagreed with the result reached in *Hogue v. Johnson,* but recognized that it was bound by the decision nonetheless. *See Barber v. Johnson,* 145 F.3d 234, 236–37 (5th Cir.), *cert. denied,* 525 U.S. 1005, 119 S.Ct. 518, 142 L.Ed.2d 430 (1998). The court noted that *"Hogue* may be viewed as inconsistent with the Supreme Court's underlying reasoning for applying the *Brecht* standard in federal habeas review." *Id.* at 236. In a case where no *Chapman* review had been conducted by any other court, the *Barber* court believed that *Brecht* was inapplicable. *See id.* at 237. However, the court

concluded that it could not ignore the holding in *Hogue* because it was bound by the rule in the Fifth Circuit that one panel may not overrule the decision of a prior panel. *See id.*

**5.** In addition to the cases cited in the text, the District of Columbia Circuit Court of Appeals implicitly found that *Brecht* is the appropriate standard on collateral review but applied *Chapman* because the government only argued *Chapman* in the district court. *See United States v. Johnson,* 216 F.3d 1162, 1166–67 (D.C.Cir.2000).

error analysis on direct appeal. In *Hassine*, the court stated:

Finality, comity, and federalism do not turn on whether the state courts have performed a *Chapman* analysis, but depend, rather, on the fact that they have rejected a defendant's direct appeal. Indeed, a federal habeas court which overturns a state conviction on collateral review still upsets a State's interest in finality, and still raises federalism, comity, and trial process concerns, regardless of whether the state courts have previously identified the constitutional error or have performed a *Chapman* analysis on direct appeal.

*Id.* at 952. As such, these courts contend that a general rule requiring a more liberal harmless error standard to be applied on collateral review advances all of the considerations discussed by the *Brecht* Court.

Consistent with petitioner's argument in this case, the Eighth Circuit Court of Appeals and a district court in this circuit have held that *Chapman* applies where a habeas petitioner has never had his claim evaluated on direct review under the more stringent *Chapman* standard. *See Orndorff v. Lockhart*, 998 F.2d 1426, 1429–30 (8th Cir.1993), *cert. denied*, 511 U.S. 1060, 114 S.Ct. 1631, 128 L.Ed.2d 354 (1994); *Lyons v. Johnson*, 912 F.Supp. 679, 687–89 (S.D.N.Y.), *aff'd on other grounds*, 99 F.3d 499 (2d Cir.1996).

The Eighth Circuit, and courts that have followed its lead, take the position that *Brecht*'s result was premised largely on comity and federalism concerns. They argue that when state courts properly apply the *Chapman* harmless error test, the federal habeas court need only review the error under the more liberal *Brecht* standard. However, where no *Chapman* analysis had been made by the state courts, and the federal habeas court is the first to review the constitutional error, they con-

tend that the rule in *Brecht* does not apply. *See Orndorff*, 998 F.2d at 1430. In support, these courts cite the *Brecht* decision's statement that:

State courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process under *Chapman*, and state courts often occupy a superior vantage point from which to evaluate the effect of trial error. For these reasons, it scarcely seems logical to require federal habeas courts to engage in the identical approach to harmless-error review that *Chapman* requires state courts to engage in on direct review.

*Brecht*, 507 U.S. at 636, 113 S.Ct. 1710 *cited in Orndorff*, 998 F.2d at 1430; *Lyons*, 912 F.Supp. at 688–89.

Moreover, these courts note that, when the federal court conducts a *Chapman* analysis after the state court, comity and federalism concerns are implicated to a much greater extent than if the federal court had been the first to evaluate the error. As the court in *Lyons* stated, "federal courts should, under *Brecht*, respectfully defer to state courts' analyses of the harmlessness of constitutional error—but where no prior state court *Chapman* holding exists, there is nothing to which to defer." 912 F.Supp. at 689.

An additional issue that implicates the proper scope of the *Brecht* decision, and the most important issue with respect to the present case, is whether, absent a prior *Chapman* analysis on direct review, *Brecht* applies only where the petitioner is seeking collateral review of a state court conviction or whether it likewise applies to review of a federal court conviction. As noted above, the considerations underlying the *Brecht* decision were finality, comity, federalism, and the sanctity of the trial process. Just as the Eighth Circuit in *Orndorff* explained that these consider-

ations are not implicated to the same degree when the state court never conducted a *Chapman* analysis, they are implicated even less where the underlying conviction is in a federal court. While finality and the sanctity of the trial process are still legitimate concerns, federalism and comity clearly are not.

■ Thus, in a collateral proceeding under § 2255 where there has been no previous *Chapman* analysis, *Brecht* applies only if concerns for finality and sanctity of the trial process are reasons enough for the less onerous harmless error standard to apply. At least one circuit court has concluded that they are. In *Singleton*, the First Circuit Court of Appeals recognized that the comity and federalism concerns expressed in *Brecht* are "plainly lacking in a collateral proceeding arising under 28 U.S.C. § 2255." 26 F.3d at 237 n. 9. The court nevertheless concluded that the *Brecht* rationale applies in the federal habeas context because it is "fundamentally anchored in traditional concerns for finality." *Id.*[6]

The Second Circuit has not directly addressed these issues, even though it has applied *Brecht* to a collateral review of a federal conviction under § 2255 where there had been no *Chapman* analysis on direct appeal. *See Peck v. United States,* 106 F.3d 450, 454 (2d Cir.1997) ("*Peck III* ").[7] The court did not explicitly hold that *Brecht* applies even if no *Chapman* analysis had been performed on direct review. It never discussed this question, presumably because it was not raised by the parties. The extent of the court's analysis was to state that "[o]n collateral review, as the [Supreme] Court explained in *Brecht,* considerations of finality, federalism, and comity warrant the application of a less-onerous harmless error standard." *Id.* From this language, it is evident that the court did not address the issue presented here since, as discussed above, federalism and comity are not justifications for applying *Brecht* in a § 2255 petition. Therefore, *Peck III* does not resolve the matter. *See In re Payroll Express Corp.,* 921 F.Supp. 1121, 1123 (S.D.N.Y.1996) ("When an issue was not raised in the circuit court, a district court is not bound by the resulting decision.").[8]

---

6. The Fifth and Eleventh Circuit Courts of Appeal have also, at least implicitly, recognized that *Brecht* may apply on collateral review of a federal conviction under § 2255. However, they did so without any discussion, and therefore, their decisions carry little weight here. *See United States v. Chavez,* 193 F.3d 375, 379 (5th Cir.1999); *Vines v. United States,* 28 F.3d 1123, 1130 (11th Cir.1994).

7. There are three Second Circuit decisions in the *Peck* case to which this Court will refer. The first decision chronologically was *Peck v. United States,* 73 F.3d 1220 (2d Cir.1995) ("*Peck I* "), which was appealed to an en banc panel. Before the panel heard the appeal, it dissolved itself in response to an intervening Supreme Court decision, and left the appeal for reconsideration by the original panel that decided *Peck I. See Peck v. United States,* 102 F.3d 1319 (2d Cir.1996) ("*Peck II* "). The original panel then issued the decision cited in the text as *Peck III.*

8. There are aspects of the various *Peck* decisions which give this Court pause in concluding that *Peck III* is not binding precedent as to the *Brecht/Chapman* issue. In *Peck I,* Judge Walker authored a dissent in which he argued that *Brecht* should apply on collateral review. *See Peck I,* 73 F.3d at 1229–33 (Walker, J., dissenting). Thereafter, in *Peck II,* Judge Newman wrote a concurring opinion, recognizing that *Brecht* applies on collateral review. *See Peck II,* 102 F.3d at 1320–21 (Newman, J., concurring).

Significantly, it was Judge Walker who then wrote the *Peck III* majority opinion in which he concluded, without discussion, that *Brecht* applied on collateral review. One might surmise that the reason he did not discuss the *Brecht/Chapman* issue in more detail in *Peck III* is because he and Judge Newman had already addressed it in previous opinions in the same case.

■ Having considered the various arguments set forth by the parties and the circuit courts that have addressed this issue, this Court finds that the rationales identified in *Brecht* for applying a less onerous harmless error standard on collateral review do not justify the application of that standard in a § 2255 proceeding where there had been no *Chapman* analysis on direct review. As discussed above, the Court can quickly disregard federalism and comity concerns as they have no application to a review of a federal conviction. This leaves the Court with concerns for finality and sanctity of the trial process, which, the Court finds, are insufficient reasons to apply *Brecht* in this case.

Applying the less burdensome harmless error standard on collateral review of a federal conviction where the habeas court is the first to review the error for harmlessness fails to take into account the fundamental purpose served by applying the strict *Chapman* standard. Justice O'Connor, dissenting in *Brecht*, stated:

> If there is a unifying theme to this Court's habeas jurisprudence, it is that the ultimate equity on the prisoner's side—the possibility that an error may have caused the conviction of an actually innocent person—is sufficient by itself to permit plenary review of the prisoner's federal claim. Whatever the source of

the *Chapman* standard, the equities may favor its application on habeas if it substantially promotes the central goal of the criminal justice system—accurate determinations of guilt and innocence.

*Brecht*, 507 U.S. at 652, 113 S.Ct. 1710 (O'Connor, J., dissenting) (citations omitted).

Justice O'Connor argued that *Chapman* should apply on habeas review in a case where three other courts had already conducted a *Chapman* analysis. Her reasoning would apply with even greater force where there has been no previous *Chapman* analysis. As the Eighth Circuit recognized, "the *Brecht* rule is based largely on the notion that because the state courts can properly apply the *Chapman* harmless error standard on direct review, the federal habeas courts need only review those decisions under the *Kotteakos* harmless error standard." *Orndorff*, 998 F.2d at 1430. However, where no *Chapman* review has been conducted by the state courts, the reasons for the federal habeas court to conduct the *Brecht* analysis largely disappear. *See id.* Similarly, federal trials only achieve a sense of finality and sanctity when a prisoner's allegedly erroneous conviction is adequately reviewed to ensure fairness and accuracy.

---

However, because the Second Circuit in *Peck III* did not address the reasons underlying its application of *Brecht*, this Court does not presume to guess whether the court considered the arguments made here, finding instead that the Second Circuit has not resolved the narrow question presented. Although *Peck III* applied *Brecht* in a factually similar situation, the most that this Court can glean from the various *Peck* decisions is that the Second Circuit has held that *Brecht* generally applies on collateral review, not that it applies even where there had been no previous *Chapman* analysis.

Finally, this Court finds support for its view that *Peck III* did not resolve the issue present-

ed here in an unpublished opinion of the Second Circuit. In *Scott v. Strack*, 164 F.3d 619, 1998 WL 636989 (2d Cir. Apr.6, 1998), a case decided after *Peck III*, the court noted the split between the Eighth Circuit and almost every other circuit to consider the issue of whether *Brecht* applies on collateral review absent a previous *Chapman* analysis. The court recognized that it had not resolved the question in *Lyons v. Johnson* and stated that it would continue to leave the question unresolved. *See Scott*, 164 F.3d 619, 1998 WL 636989, at *3. Notably, Judge Calabresi sat on both panels that decided *Scott* and *Peck III*.

This Court agrees with the *Lyons* court, that *Brecht* was premised largely on respect for the actual, conscientious review of harmlessness performed by another court, state or federal. *See Lyons,* 912 F.Supp. at 689. Absent such a review to determine whether an error contributed to a conviction "beyond a reasonable doubt," there are compelling reasons for the habeas court to apply *Chapman.* Since the *Chapman* standard applies on direct review in order to ensure accurate determinations of guilt or innocence, it is essential that a prisoner not lose the benefit of that analysis merely because his or her claim is brought in a collateral proceeding. As long as a court—either on direct or collateral review—is the first to conduct a harmless error analysis, it should be required to conduct a *Chapman* analysis in order to "restore our faith in the verdict's accuracy to a reasonable certainty." *Brecht,* 507 U.S. at 654, 113 S.Ct. 1710 (O'Connor, J., dissenting). Therefore, this Court will apply the *Chapman* harmless error analysis to Monsanto's *Richardson* claim.

### C. Application of the *Chapman* Harmless Error Standard

■ To reiterate the standard of review under *Chapman,* a court will vacate a conviction based on a trial error unless the government can prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman,* 386 U.S. at 24, 87 S.Ct. 824. The question *Chapman* instructs the reviewing court to consider "is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). In other words, the inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been ren-

dered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.* (emphasis in the original).

In *Neder v. United States,* the Supreme Court addressed the application of *Chapman* in a case where the lower court erroneously omitted an element of a crime from its jury instruction. The Court first determined that, "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *Neder,* 527 U.S. at 17, 119 S.Ct. 1827.

On the other hand, if the evidence supporting the omitted element is contested, *Neder* directs a different inquiry. The Second Circuit summarized the inquiry as follows:

> In sum, *Neder* instructs that, in reviewing a trial court's instruction that erroneously omits an element of the offense, we should begin by asking whether the evidence in the record could rationally lead to a finding favoring the defendant on the omitted element. If the answer to that legal question is "no," we should conclude that the error was harmless. If the answer is "yes," we must then ask whether the verdict, absent the error, would have been the same. If we conclude that the answer to that second question is "yes" beyond a reasonable doubt, the error was harmless.

*United States v. Jackson,* 196 F.3d 383, 386 (2d Cir.1999), *cert. denied,* 530 U.S. 1267, 120 S.Ct. 2731, 147 L.Ed.2d 993 (2000).

This Court will begin its harmless error review with the jury's verdict. The jury convicted Monsanto on both the substan-

tive RICO count and the RICO conspiracy count. In finding petitioner guilty on Count One, the substantive RICO count, the jury unanimously found that the government had proved, among others not relevant here, R.A. 5, conspiracy to distribute heroin from 1981 up to and including the date of the filing of the Indictment, and R.A. 7, possession of heroin with intent to distribute at 933 Sheffield Road, Teaneck, New Jersey. However, the jury found that the government had not proved R.A. 8, possession of heroin with intent to distribute at 250 Gorge Road, Cliffside Park, New Jersey.[9] Thus, it is clear from the verdict form that the jury found that Monsanto had committed at least two predicate narcotics offenses. The question remaining then is whether the jury would have found that Monsanto committed at least one additional narcotics violation absent the *Richardson* error.

**9.** The jury found that the government had proved all three narcotics-related racketeering acts in finding Monsanto guilty on Count Two, RICO conspiracy, including R.A. 8. In order to have found that the government had not proved R.A. 8 under the substantive RICO charge and to have found that the government had proved the same act under the RICO conspiracy charge, the jury must have found that Monsanto conspired to possess, but did not actually possess, heroin with intent to distribute in 1985 at Gorge Road, Cliffside Park, New Jersey. While the conspiracy identified in R.A. 8 is itself a violation of the narcotics laws, it cannot provide the third predicate offense for the CCE count because it is necessarily subsumed into the conspiracy charged in R.A. 5, which continued from 1981 up to and including the date of the Indictment.

**10.** Monsanto also contends that some of the narcotics violations which the government relies on here were not charged in the Indictment, and therefore, cannot serve as the basis for predicate acts under the CCE statute. The Court agrees. Judge Sand explained, even before the Supreme Court decided *Richardson:*

## 1. Whether the Evidence of a Third Narcotics Violation Was "Uncontested" and "Overwhelming"

The government argues that had the jury been properly instructed on the CCE count, it would have found that Monsanto committed at least one of thirty-eight different narcotics violations. To support its argument, the government relies primarily on the testimony of James Canady, Clarence Joyner, Steven McGauley, Linda Harding, and Vito Loiacano. The government contends that the testimony of these witnesses was corroborated by the consistency between their testimony, as well as by documentary and other physical evidence. Monsanto counters that the witnesses relied on by the government were thoroughly impeached and discredited by their agreements to cooperate with the government, past criminal acts, and past acts of lying under oath.[10]

Whatever its ultimate legality, there are serious doubts about the wisdom of allowing acts not mentioned anywhere in the indictment at all, including the overt acts portion of a conspiracy count, to be used as predicates capable of supporting the "continuing series of violations" element. Few constitutional principles are more firmly established than a defendant's right to notice of the charges against him. A defendant should not be faced with the prospect of having to defend against substantive narcotics violations which he has no reason to believe will be used against him at trial. 3 Leonard Sand *et al.,* Modern Federal Jury Instructions, ¶ 56.03 cmt. at 56–64 (2000).

In light of *Richardson*'s holding that the narcotics violations making up the "continuing series of violations" are "elements" of the CCE crime, it is axiomatic that such predicates must be charged in the Indictment. Therefore, in evaluating whether the jury's verdict would have been the same absent the *Richardson* error, the Court will limit its review of the evidence to the narcotics violations which were charged in the Indictment. Since Joyner, McGauley, and Harding are the only witnesses relied on by the government here who testified about the narcotics viola-

Initially then, it is clear that this case is unlike *Neder* in that this Court cannot conclude beyond a reasonable doubt that the omitted element was "uncontested and supported by overwhelming evidence." *Neder*, 527 U.S. at 17, 119 S.Ct. 1827. As Monsanto accurately points out, all of the government's witnesses were vigorously cross-examined and their credibility was at least called into question. Thus, the Court must consider whether, after a thorough examination of the entire record, it can "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Id.* at 19, 119 S.Ct. 1827.

### 2. Whether The Evidence Could Rationally Lead to a Finding Favoring Petitioner on the Omitted Element

Joyner and McGauley were members of Monsanto's "crew." The defense portrayed them to the jury as violent drug dealers who had lied to law enforcement officers in the past. For example, on cross-examination, Joyner stated that he took part in the murder of Sam Hawkins and another individual. *See* Tr. at 4159–60. He also admitted to firing a gun at people on ten or fifteen different occasions, *see id.* at 4165–66, and participating in approximately twenty armed robberies. *See id.* at 4175–76. Joyner further stated that he lied to law enforcement authorities on a previous occasion after entering into a cooperation agreement under which he was obligated to tell the truth. *See id.* at 4196, 4201–02.

Monsanto contends that McGauley was impeached with: his entire life history of violent crime; his motive to testify falsely against Monsanto and other defendants for abandoning McGauley when he was arrested; his motive to testify for the government because of his deal with the government; and his numerous prior inconsistent statements to law enforcement. In addition, Monsanto points out that McGauley's lack of credibility was the centerpiece of the defense and Monsanto has consistently argued that McGauley fabricated his testimony.[11]

Harding testified on direct examination that she was arrested twenty-nine times by the time she reached the age of thirty-one, primarily for running Three–Card Monte Games. *See id.* at 9276–77. She testified on cross-examination that at some point after 1985 she had been addicted to crack. *See id.* at 9390. Harding's testimony principally related to the activities of Monsanto and Barry Judd, her live-in boyfriend and the father of her two children. *See id.* at 9276. In August of 1987, Harding learned that Judd was having an affair. *See id.* at 9443. Approximately two weeks later, Judd and Harding had a physical fight as a result and Judd told her that he was going to have her killed. *See id.* at 9356, 9444. Harding called the Baltimore police and told them about the threat. *See id.* at 9445. The federal government subsequently became involved and offered Harding immunity for all her crimes if she would testify against Judd in Baltimore. *See id.* at 9388, 9444–45.

tions charged in the Indictment, the Court will only consider their testimony, and not that of Canady or Loiacano.

**11.** At a hearing held on December 22, 1998 in response to Monsanto's claim that McGauley intended to recant his trial testimony about the murder charges against Monsanto, McGauley took the stand and testified that he

did not intend, nor had he ever intended, to recant his testimony. He also affirmed under oath that his trial testimony had been truthful. Thus, this Court has previously determined that Monsanto failed to prove that McGauley committed perjury. *See Monsanto*, 2000 WL 1206744, at *5.

Based on the cross-examination of the government's witnesses, the jury could, in theory, have concluded that none of the government's witnesses was credible and that the government did not establish beyond a reasonable doubt that Monsanto engaged in the same three narcotics violations. However, the Court must now determine whether the verdict would nevertheless have been the same absent the *Richardson* error.[12]

### 3. Whether the Verdict, Absent the Error, Would Have Been the Same

■ As discussed above, the government identifies thirty-eight substantive narcotics violations which, it argues, were proved at trial. The Court will limit its review of the evidence to the narcotics violations which were charged in the Indictment. *See supra* n. 10.

### a. The Distribution of Heroin to Robert Cofer, Larry Caldwell, Arnold Lawson, Gary Simmons, Alex Simmons, William Norris, Sedgwick Harvey, and Lawrence Williams

The Indictment charged that Robert Cofer, Larry Caldwell, Arnold Lawson, Gary Simmons, Alex Simmons, William Norris, Sedgwick Harvey, and Lawrence Williams distributed heroin which they re-

ceived from Monsanto. *See* Count Three, O.A. 1–6. Joyner and McGauley testified about these narcotics violations.

### i. Joyner's Testimony

Joyner testified that in November or December 1982, he and Monsanto met at Jacqueline Brown's restaurant and made arrangements for the pickup of one hundred quarters of heroin. They agreed to meet later at Brown's apartment which, Joyner testified, was located at 170th Street and Clay Avenue, four or five buildings down from the Jet Set Deli. *See* Tr. at 3835–36.

Joyner subsequently went to the Jet Set Deli, where he met with Monsanto and other crew members, including Williams, Cofer, Gary Simmons, Alex Simmons, and someone identified as Mike. The crew members waited at the Jet Set Deli until they received a telephone call. After receiving the call, they proceeded in groups of twos and threes, as per Monsanto's instructions, to Brown's apartment, which was located on the third floor. *See id.* at 3837–39.

When Joyner entered the apartment, he saw Monsanto, Brown, and several other individuals. He also saw a large brown leather bag on a table. *See id.* at 3840–41. The bag contained a number of white plastic bags with no markings on them. Mon-

---

12. Monsanto would have the Court end the inquiry before reaching this question and find that because the government's witnesses were impeached, the error could not have been harmless. His position finds support in *United States v. Brown*, 202 F.3d 691 (4th Cir. 2000). In *Brown*, the court held that where a defendant genuinely contested the evidence supporting each alleged predicate offense in support of his CCE conviction, and there was a basis in the record for the jury to have rationally refused to believe the testimony of the government's witnesses, the *Richardson* error could not have been harmless. *See id.*

at 702. However, in *Brown* the Fourth Circuit did not engage in the additional inquiry identified by the Second Circuit in *Jackson, supra* at 286–87. The Fourth Circuit explicitly rejected *Jackson*'s articulation of the *Neder* standard, finding that *Neder* does not require the reviewing court to take the additional step of asking whether the jury would have returned the same verdict of guilty if there was sufficient evidence to permit a jury to find in favor of the defendant on the omitted element. *See Brown*, 202 F.3d at 701 n. 19. Because the Second Circuit instructs the Court to engage in this additional inquiry, the Court cannot accept Monsanto's argument.

santo handed out the white plastic bags to the crew members and instructed them on how to "strain" the contents of the bags. *See id.* at 3841. "Straining" referred to diluting the heroin with quinine and mannite. Monsanto instructed the crew members to strain the heroin ten times. *See id.* at 3841–42.[13]

From November or December 1982 until approximately March 1983, Joyner returned to Brown's apartment about once a week, and started receiving 320 to 350 quarters of heroin. On one occasion, Joyner observed that the number of quarters and his nickname were marked on the bag of heroin he received from Monsanto. *See id.* at 3844–45. During this time, Joyner witnessed other crew members receiving white bags from Monsanto similar to those he was receiving. *See id.* at 3846.

In December 1983, after meeting with Monsanto several times, Joyner went to the Jet Set Deli where he, Cofer, Lawson, Gary Simmons, and Alex Simmons waited for Monsanto. After Monsanto sent a message to the group, they proceeded upstairs to Brown's apartment in groups of twos and threes. Once they arrived upstairs, Monsanto distributed bags of heroin to them from another bag. *See id.* at 3915–16. Joyner received one hundred quarters of heroin in white plastic bags and paid Monsanto $30 per quarter. The white plastic bags Joyner received had no markings on them. *See id.* at 3917.[14]

Although Monsanto argues that the defense thoroughly impeached Joyner, there is reason to believe that the jury did not wholly discredit Joyner's testimony. The government pointed out in its summation that Joyner testified about the events which ultimately led to the murders of William Graham, Billy Shuff, and Martin Pitt. *See id.* at 13,957. On Counts One and Two, the jury found that the government proved Monsanto's involvement in R.A. 2, the conspiracy to murder Graham, Pitt, and Vincent Reynard, R.A. 3, the murder of Graham, and R.A. 4, the murder of Shuff. The jury appears to have credited Joyner's testimony with respect to these murders, and therefore, it is reasonable to conclude that the jury did not completely disregard Joyner's testimony concerning Monsanto's narcotics activities.

### ii. McGauley's Testimony

McGauley testified that in May 1984, he saw Monsanto distribute heroin to Cofer, Lawson, Caldwell, Gary Simmons, Alex Simmons, Norris, Harvey, and others.[15] This group of crew members first met at a location known as Lisa's Restaurant where they were told by Monsanto to assemble in front of "Merciful's store" which, according to McGauley, was three or four buildings away from Brown's apartment. *See id.* at 1839–40.

Once Monsanto went into Brown's building, the remaining crew members proceed-

---

**13.** Monsanto's "drug ledger," a notebook in which he kept notes of his narcotics activities, contained notations in his handwriting indicating formulas for mixing heroin with quinine and mannite. *See* Government Exhibit ("GX") C–61, at 2.

 McGauley also testified that when he received heroin from Monsanto, Monsanto instructed him to strain the heroin ten times. *See* Tr. at 1739, 2079.

**14.** In addition to the incidents described above, Joyner testified that he received heroin

from Monsanto at Brown's apartment weekly from January or February 1985 through the middle of 1985, and saw Monsanto distribute heroin to Cofer, Gary Simmons, Alex Simmons, and others on those occasions. *See* Tr. at 4047–49.

**15.** McGauley testified that he was also present on another occasion in July or August 1984 at which time he witnessed Monsanto distribute heroin to various crew members. *See* Tr. at 1845.

ed up to the apartment in groups of one, two, or three at a time. When McGauley entered the apartment, which he stated was on the third floor, he saw a table in the kitchen with individual bags of "dope" on top. *See id.* at 1841. McGauley received a bag which was marked "320," indicating the number of quarters in the bag. *See id.* at 1842.[16] McGauley saw Monsanto personally hand out the bags of heroin to the other crew members. *See id.* at 1843.

As with Joyner, there is reason to believe that the jury credited McGauley's testimony. McGauley testified about Monsanto's role in the murders of Graham, Shuff, and Bobby Walker, and the jury found that the government proved Monsanto's involvement in these murders. Based on the verdict, the Court concludes that the jury found McGauley to be credible and did not disregard his testimony about Monsanto's narcotics activities.

### b. The Distribution of Heroin to Barry Judd

The Indictment charged that Monsanto distributed heroin to Barry Judd, which Judd sold in Baltimore, Maryland. *See* Count Three, O.A. 7. Linda Harding testified that in January 1984, Judd instructed Harding to call a taxi to take him to a Burger King Restaurant on 223rd or 225th Street and Broadway in the Bronx to meet Monsanto. *See* Tr. at 9308–09. Judd returned from the Burger King restaurant forty-five minutes to one hour later with two small white garbage bags containing a white or off-white powder, arranged in the bags like flour. *See id.* at 9311.

Judd put the bags in a safe in their apartment and, approximately a day later, took one of the bags out of the safe to have its contents tested. He then returned the bag to the safe. *See id.* at 9312. The next day, Harding packed a small duffle bag with clothes and Judd put the white plastic bags in the duffle bag. Judd told Harding that he was going to Baltimore to sell "dresses" because he could get three times as much money in Baltimore than he could in New York. "Dresses" referred to the white plastic bags. *See id.* at 9313–14. When Judd returned from Baltimore two weeks later, he had the duffle bag filled with money in stacks of hundreds and thousands. *See id.* at 9315. He told Harding that the money belonged to Monsanto and he asked Harding to call a taxi to take him to the Burger King Restaurant. *See id.* at 9316.[17]

### c. Assessing the Evidence

In sum, the government presented considerable evidence concerning the narcotics violations charged as overt acts in Count Three of the Indictment. The evidence was corroborated by the congruence among the witnesses' testimony and by physical evidence. Furthermore, Monsanto's argument that the jury could have discredited the testimony of the government's witnesses, for example, Joyner and McGauley, is belied by the fact that the jury convicted Monsanto of other crimes about which these witnesses testified. Having sat through the presentation of the evidence, it is the Court's view that the jury would have unanimously found that

---

16. Joyner testified that he had received bags of heroin from Monsanto marked with his nickname and the number of quarters in the bag. *See supra* at 37.

17. A note from Monsanto to Pat Doll, one of his girlfriends, stated, "Pat, Please deliver these bags right away ... Barry at the usual hamburger place." GX A–29. The "usual hamburger place" presumably referred to the Burger King where Judd picked up heroin from Monsanto.

Monsanto engaged in at least one additional violation of the narcotics laws as a predicate to the "continuing series of violations" element of the CCE charge. Therefore, the Court concludes beyond a reasonable doubt that a guilty verdict would have been returned on the CCE count absent the *Richardson* error.

## CONCLUSION

For the foregoing reasons, petitioner is denied habeas corpus relief based on the Court's erroneous jury instruction concerning the "continuing series of violations" element of the continuing criminal enterprise charge and the petition is dismissed.

It is so ordered.